# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                No. CR 08-0057 JB

JABSIE DWAYNE LEWIS,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Sealed Motion to Reconsider Sealed Order Denying Motion for Relief Under Section 404 of the First Step Act, filed May 15, 2019 (Doc. 176)("Motion"). The primary issues are: (i) whether the Court erred, under the Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018)("First Step Act"), by not granting Lewis an in-person sentencing hearing at which he could allocute; (ii) whether the Court erred in construing First Step Act motions for sentence reduction as 18 U.S.C. § 3582(c)(2) proceedings; (iii) whether the Court improperly relied on the lack of a United States Sentencing Commission Guidelines amendment regarding the First Step Act in determining Defendant Jabsie Dwayne Lewis' eligibility for First Step Act relief; (iv) whether the Court improperly restricted its ability to impose a sentence below the applicable Guidelines range based on Dillon v. United States, 560 U.S. 817 (2010)("Dillon"); and (v) whether the Court erred in applying the 2009 Guidelines manual, rather than the 2018 manual, to its sentencing decision. The Court concludes that (i) the Court did not err by not granting Lewis an in-person sentencing hearing, because the First Step Act does not require plenary resentencing and does not require a hearing at which the defendant is present; (ii) the

Court, upon further review, concludes that First Step Act motions for sentence reduction are governed by 18 U.S.C. § 3582(c)(1)(B), and not by 18 U.S.C. § 3582(c)(2); (iii) the Court did not rely on the lack of a Guidelines amendment regarding the First Step Act in determining Lewis' eligibility for relief; (iv) the Court did not improperly restrict its ability to impose a sentence below the applicable Guidelines range, and it conducted a thorough review of the 18 U.S.C. § 3553(a) factors in determining Lewis' recalculated sentence; and (v) the Court, upon further review, concludes that the 2018 Guidelines manual applies, but that the same advisory range ensues under either manual, so the Guidelines calculation remains unchanged. Accordingly, the Court grants the Motion in part and denies it in part.

## FACTUAL BACKGROUND

The Court outlined the facts and circumstances surrounding Lewis' offense in <u>United States v. Lewis</u>, No. CR 08-0057 JB, 2019 WL 2192508, at *1-8 (D.N.M. May 21, 2019)(Browning, J.)("MOO"). The Motion raised no objection to the facts as presented in the MOO. <u>See</u> Motion at 1-9. The Court incorporates the MOO's facts here.

## PROCEDURAL BACKGROUND

Lewis does not present any new evidence in his Motion, and he does not attack any of the Court's factual findings in the MOO. <u>See</u> Motion at 1-8. Instead, Lewis contends that: (i) the Court erred, under the First Step Act, by not granting Lewis an in-person sentencing hearing at which he could allocute; (ii) the Court erred in construing First Step Act motions for sentence reduction as 18 U.S.C. § 3582(c)(2) proceedings; (iii) the Court improperly relied on the lack of a Guidelines amendment regarding the First Step Act in determining Lewis' eligibility for First Step Act relief; (iv) the Court improperly restricted its ability to impose a sentence below the applicable Guidelines range based on <u>Dillon v. United States</u>; and (v) the Court erred in applying

the 2009 Guidelines manual, rather than the 2018 manual, to its sentencing decision. <u>See</u> Motion at 1-9. The United States did not file a response. The Court held a hearing on June 5, 2019. <u>See</u> Clerk's Minutes, filed June 5, 2019 (Doc. 180).

1.      **<u>The Motion</u>.**

On May 15, 2019, Lewis filed the Motion. <u>See</u> Motion at 9. In the Motion, Lewis asks the Court to reconsider its MOO. <u>See</u> Motion at 1. Lewis makes five arguments in the Motion.

First, Lewis argues that the Court erred in not granting him an in-person hearing, which he did not waive, and at which he intended to present additional information, including allocution. <u>See</u> Motion at 1. Lewis cites his notice of non-consent to Telephonic Hearing. <u>See</u> Non-Consent to Telephonic Hearing and Request for Postponement of Hearing, filed March 21, 2019 (Doc. 165)("Notice of Non-Consent"). Lewis contends that the Court should have read his Notice of Non-Consent and request for a hearing as a notice of intent to present additional facts not already before the Court. <u>See</u> Motion at 1-2. Lewis cites <u>United States v. Bustamante-Conchas</u>, 850 F.3d 1130 (10th Cir. 2017), for the proposition that it is plain error to deny a defendant the right to allocute. <u>See</u> Motion at 2. Lewis contends that he did not waive his right to an in person hearing. <u>See</u> Motion at 1-2. Lewis also argues that the Court based its decision in the MOO "almost entirely on ten-year old information." Motion at 2. Lewis cites the relative lengths of the Court's discussion of Lewis' Letters in Support, <u>see</u> Reply to Response From Probation and Government to Emergency Motion to Resentence at 7-13, filed March 18, 2019 (Doc. 162)("Letters in Support"), and the Court's discussion of Lewis' criminal history and offense conduct as described in the PSR, <u>see</u> Motion at 2. Lewis argues that the holding in <u>Pepper v. United States</u>, 562 U.S. 476 (2009), that a district court may, at resentencing, consider a defendant's post-sentencing rehabilitation evidence, suggests that the "denial of the opportunity to present such evidence was

- 3 -

error."  Motion at 2-3.  Lewis argues that a First Step Act § 404 proceeding is most analogous to a sentencing proceeding, governed by rule 42(a)(3) of the Federal Rules of Criminal Procedure, rather than to a sentencing correction, which rule 43(b)(4) of the Federal Rules of Criminal Procedure governs, and that accordingly, a defendant's presence at a First Step Act hearing is required.  See Motion at 3.  In support of this argument, Lewis refers to the First Step Act's use of the verb "impose."  Motion at 3 (citing First Step Act § 404).  Lewis argues that the "limited exception to the defendant's required [presence] at sentencing does *not* apply to statutes described by 18 U.S.C. § 3582(c)(1)(B)," but rather applies "only to proceedings that are authorized by Section 3582(c) itself" as a result of retroactive Guidelines changes or a Bureau of Prisons motion to reduce a sentence based on extraordinary and compelling reasons.  Motion at 3-4.

Second, Lewis argues that, contrary to the Court's statement in the MOO that "First Step Act motions for sentence reduction are 18 U.S.C. § 3582(c)(2) proceedings," First Step Act motions to reduce sentences are not 18 U.S.C. § 3582(c)(2) proceedings, because the First Step Act modifies statutory ranges and does not effectuate a Guidelines amendment.  Motion at 4 (quoting MOO, 2019 WL 2192508, at *19) .  Lewis argues that 18 U.S.C. § 3582(C)(2)'s text refers only to cases where a defendant has been sentenced "based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . . ."  Motion at 4 (quoting 18 U.S.C. § 3582(c)(2)).  Lewis argues, accordingly, that § 404 establishes a freestanding remedy which is less restrictive than an 18 U.S.C. § 3582(c)(2) proceeding.  See Motion at 5.

Third, Lewis objects to the Court's statement in the MOO's footnote 14 that "'The United States Sentencing Commission has yet to promulgate a Guidelines amendment to officially effectuate the First Step Act.'"  Motion at 5 (quoting MOO, 2019 WL 2192508, at *19 n.14).  Lewis argues that the Sentencing Commission has stated that the First Step Act contains no

directives to the Sentencing Commission.  See Motion at 5 (citing U.S.S.C. Office of Education and Sentencing, Practice Insider Express Special Edition, available at https://www.ussc.gov/sites/default/files/pdf/.../2019-special_FIRST-STEP-Act.pdf ("U.S.S.C. First Step Act Practice Insider")).  Lewis also argues that the Sentencing Commission "cannot move on any amendments until it has sufficient voting members to promulgate amendments," and that the Sentencing Commission currently has only two voting members.  Motion at 5-6 (citing U.S.S.C. First Step Act Practice Insider).

Fourth, Lewis argues that Dillon is irrelevant to a First Step Act § 404 proceeding, because a First Step Act proceeding is not a Guidelines amendment case.  See Motion at 6.  Lewis argues, accordingly, that "there is no limitation on a Court's ability, at sentencing, to impose a sentence below the applicable guideline range," in a First Step Act case.  Motion at 6.  Lewis cites to several federal district court cases imposing post-First Step Act sentences below the advisory Guidelines range.  See Motion at 7.

Fifth, Lewis argues that the Court erred in concluding that the 2009 Guideline manual, rather than the 2018 manual, applied to its sentencing decision.  See Motion at 8.  Lewis argues that the "general rule is that a defendant should be sentenced under the law in effect at the time of sentencing."  Motion at 8.  Lewis contends that § 3553(a)(4) "states that the guidelines 'in effect on the date the defendant is sentenced' apply, except as provided in § 3742(g)(1)."  Motion at 8 (quoting 18 U.S.C. § 3553(a)(4)(A)(ii)).  Lewis contends that the only exception to § 3553(a)(4)(A) other than § 3742(g)(1) is the Ex Post Facto Clause and that, absent an "ex post facto violation, a court must apply the current guidelines at resentencing, must apply other law as it stands at the time of resentencing, and must resentence a defendant in light of factual circumstances as they stand at resentencing."  Motion at 8.  Lewis concludes by requesting that

the Court reconsider its MOO, grant him a sentencing hearing where he may allocute and where he may "present factors relevant to this Court's consideration pursuant to § 3553," and that the Court "grant him a reduced sentence." Motion at 9.

## 2. **The Hearing.**

The Court held a hearing on June 5, 2019. See Draft Transcript of Motion Hearing at 1:1-2 (Court)(taken June 5, 2019)("Tr.").[1] The Court asked Lewis to begin with the issue of his entitlement to an in-person hearing. See Tr. at 2:2-3 (Court). Lewis began by discussing United States v. Potts, CASE NO. 2:98-cr-14010, 2019 WL 1059837 (S.D. Fla. March 6, 2019)(Rosenberg, J.), which the Court cited in its MOO. See Tr. at 2:9-11 (Converse). Lewis argued that the Honorable Robin L. Rosenberg, United States District Judge for the United States District Court for the Southern District of Florida, who decided United States v. Potts, commented during a later hearing on the case that, although she understood some judges "with the agreement of both parties" resentence under the First Step Act without the defendant present, she "really wanted to see who [the defendant was], who [the defendant is], and understand what [the defendant might] need if the court were to resentence [the defendant] . . . ." Tr. at 2:14-21 (Converse). Lewis argued that Judge Rosenberg "express[ed] her pleasure that Mr. Pot[t]s was there," and Lewis averred that "that's because in many cases, and we submit this is one of them, who the person is today is not who they were before." Tr. at 3:1-6 (Converse).

Lewis contended that "[j]ust yesterday," on June 4, 2019, in the United States District Court for the Middle District of Pennsylvania, the court held that a defendant was "entitled to a full

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

resentencing hearing and anything less would be a miscarriage of justice."[2]  Tr. at 3:6-10 (Converse).  Lewis contended that in the Middle District of Pennsylvania case, the defendant "was sentenced [pre-<u>Booker</u>] under [the] mandatory guideline[s] scheme."  Tr. at 3:11-13 (Converse).  Lewis averred that the judge in the Middle District of Pennsylvania case indicated that the only appropriate way to thoroughly evaluate the defendant's characteristics "through the prism" of 3553(a) was to "have him appear in open court and provide him with an opportunity to fully [allocute]."  Tr. at 3:14-18 (Converse).  Lewis indicated that he was not sure "if the court needs to reach the issue of whether this is a hearing under . . . any section of 3582."  Tr. at 4:4-7 (Converse).  Lewis argued that many courts have held that First Step Act motions are independent of 18 U.S.C. § 3582, or that § 3582 places no restrictions on a First Step Act resentencing court.  <u>See</u> Tr. at 4:7-9 (Converse).  Lewis referred to a case out of the United States District Court for the District of Connecticut, published on May 20, 2019, in which the defendant was present at the hearing and given the opportunity to allocute, and the only authority to which the district court cited to allow him to allocute was the First Step Act.[3]  <u>See</u> Tr. at 4:9-14 (Converse).  The United States did not take a position on whether the Court committed error in not having Mr. Lewis present at a hearing.  <u>See</u> Tr. at 4:20-24 (Court, Spiers).  When pressed, the United States averred that its position is identical to the one the Court articulated in its MOO -- that Lewis does not have a right to be present at a hearing.  <u>See</u> Tr. at 7:2-17 (Spiers, Court).  The Court stated that it still does not "see

---

[2]The Court was unable to determine to which case Lewis referred, having searched for cases out of the Middle District of Pennsylvania published on June 4, 2019, and having yielded nothing akin to the case Lewis described at the hearing.  Lewis later alerted the Court that the case to which he referred is <u>United States v. Rhines</u>, 4:01-cr-00310-JEJ.

[3]The Court was unable to determine to which case Lewis referred, having searched for cases out of the District of Connecticut published on May 20, 2019, and having yielded nothing akin to the case Lewis described at the hearing.

the defendant telling me anything in the statute that requires" a hearing and noted that the Court attempted to set up a telephonic hearing, but that Lewis "indicated he was kind of in a rush," so the Court issued a written opinion. See Tr. at 8:14-22 (Court). The Court stated that its inclination is "to think on these first step hearings that a hearing is not required," and expressed its belief that "most courts have said that," but that the Court would "look at it and make sure that I haven't missed anything." Tr. at 9:17-23 (Court).

On the second issue, whether courts should construe a First Step Act motion for sentence reduction as a § 3582 proceeding, Lewis stated that his "briefing is fairly comprehensive on that," and that the Sentencing Commission "itself disagrees with Your Honor on that point." Tr. at 10:5-8 (Converse). Lewis argued that the First Step Act was not accompanied by any Guidelines changes, and that § 3582(c)(2) applies exclusively where a Guidelines amendment has been made retroactive. See Tr. at 10:5-18 (Lewis). Lewis also averred that there is no Sentencing Commission quorum right now to propose amendments. See Tr. at 11:17-19 (Lewis). The Court asked why there is no quorum, and Lewis stated that he is "happy to research that . . . and provide further authority," but that he did not then know. Tr. at 11:23-12:8 (Converse).

The Court asked what difference it makes if the motion is construed as a § 3582(c)(2) proceeding or a § 404 proceeding. See Tr. at 12:9-11 (Court). Lewis argued that the difference is "what is considered at sentencing and what limitations exist," because Dillon imposes limitations on § 3582(c)(2) proceedings, but no such limitations exist for § 404 proceedings. See Tr. at 12:12-19 (Converse). The Court asked what limitations exist under § 3582(c)(2) that do not exist under § 404, and Lewis averred that Dillon restricts the court's ability in a § 3582(c)(2) proceeding to vary below the advisory guidelines range. See 12:23-13:5 (Court, Converse). The Court asked whether it had not, in the MOO, considered all factors in arriving at its sentence determination.

See Tr. at 14:3-5 (Court). Lewis responded that the Court stated in the MOO that the First Step Act only contemplates a recalculation of the defendant's Guidelines numbers and a possible resentencing consistent therewith, and the Court responded that the Guidelines range with which the Court was working might have placed Lewis at time served, and that the Court considered every factor it knew about Lewis, "including materials he presented of late and his PSR[.]" Tr. at 14:3-23 (Court, Converse). Lewis averred that the Court mentioned Lewis' lack of serious disciplinary infractions while incarcerated, but that the Court did not consider "the harsh additional punishment that comes from having his son and his brother murdered while he's in prison and not being able to grieve with the family." Tr. at 15:1-7 (Converse). The Court asked whether that information was in the materials presented to the Court, and Lewis said that he believed that it was. See Tr. at 15:8-11 (Court, Lewis). The Court asked why Lewis believed that the Court had not considered it, and Lewis stated that the Court did not mention it in the MOO, to which the Court responded that it read and considered all of the material that Lewis provided. See Tr. at 12-18 (Court). The Court located this information in the Summary Reentry Plan - Progress Report at 3, filed February 11, 2019 (Doc. 153)(noting that "[i]nmate communicates well with staff and there are no known issues with other inmates. He is hesitant to return to New Mexico because his son and his little brother were murdered in Albuquerque, New Mexico").

Lewis argued that the Court held itself constrained to just perform a Guidelines recalculation, and that the Court should hear from Lewis to "get a much better feel for if he's the person that you feared putting back out on the streets today, or if he's changed by talking with him and seeing him." Tr. at 15:19-16:11 (Converse). Lewis also argued that "there's a high probability that his criminal history that Your Honor relied so heavily upon exists because of his race" and cited statistics that "[t]he lifetime likelihood of imprisonment for all men is one in nine. For white

men it's one in 17.  For black men, it's one in three."  Tr. at 16:12-23 (Converse).  Lewis cited

additional statistics regarding racial disparities in criminal charging and sentencing, and stated that

he would present additional information and data at a hearing, if permitted.  See Tr. at 16:24-18:19

(Converse).  Lewis also argued that the Court did not address in the MOO that, if Lewis were

sentenced today, he would not be eligible for the § 851 enhancement, because the predicate

offenses that qualify for an § 851 enhancement have changed, and Lewis' simple cocaine

possession offense, which formed the predicate for his § 851 enhancement, no longer qualifies.

See Tr. at 18:20-19:2 (Converse).  Lewis averred that "there are many courts that have varied on

that very basis, Your Honor."  Tr. at 18:3-4 (Converse).  The United States responded that Dillon

indicates that a First Step Act hearing, if there is one, "is not meant to be a plenary hearing," and

that the Court's MOO demonstrates that the Court "was not constrained . . . in its reasoning" or

bound to a Guidelines analysis, when the Court "methodically and deliberately" went through a

§ 3553(a) analysis.  Tr. at 19:10-25 (Spiers).  The United States argued that the Court's MOO

evolved into a plenary consideration of Lewis, even though that analysis is not a requirement.  See

Tr. at 20:5-7 (Spiers).  The United States averred that it would not respond to Lewis' arguments

about the "racial issues" pertaining to his criminal history, because it would not be able to

effectively respond, given that the United States did not have "advance notice of that particular

feature to this hearing."  Tr. at 20:20-21:4 (Spiers).  The United States took the position that, under

§ 3582, substantial assistance to authorities would warrant a downward departure or variance, but

here, substantial assistance did not occur.  See Tr. at 21:4-9 (Spiers).  The United States averred

that First Step Act motions should be considered as a synthesis of a § 3582 proceeding and a § 404

proceeding, but that, in the end, it is a § 3582 proceeding.  See Tr. at 22:10-16 (Spiers).  Lewis

replied that <u>United States v. Dillon</u> preceded the First Step Act by many years, so it does not hold that First Step Act motions are § 3582(c)(2) proceedings.  <u>See</u> Tr. at 22:20-23 (Converse).

Lewis averred that some courts have held that § 3582(c)(1)(b) is the applicable statute, and that, although Lewis disagrees, § 3582(c)(1) talks about a term of imprisonment that a court may modify pursuant to statute.  <u>See</u> Tr. at 22:24-23:7 (Lewis).  Lewis noted that the Court quoted § 3582(c)(1)(b) in its opinion.  <u>See</u> Tr. at 23:7-9 (Lewis).  Regarding the issue of which Guidelines manual the Court should have used, Lewis stated that his briefing was comprehensive.  <u>See</u> Tr. at 24:13-15 (Converse).  The United States remarked that the Guidelines range come out the same way under either manual.  <u>See</u> Tr. at 25:5-11 (Spiers).  Lewis agreed that the Guidelines range does not change under either manual.  <u>See</u> Tr. at 25:15-16 (Converse).  The United States noted that, in calculating Lewis' eligibility, the United States Probation Office referred to the 2018 Guidelines.  <u>See</u> Tr. at 26:2-4 (Spiers).

Lewis next argued that the Court erroneously concluded that it could not vary Lewis' sentence below his advisory Guidelines range, and that, since Lewis filed the Motion, several cases have come out varying below the Guidelines range.  <u>See</u> Tr. at 26:7-27:21 (Converse).  Lewis averred that "there have been a lot of developments in the law since Your Honor was preparing the memorandum opinion and order and since I filed the motion to reconsider."  Tr. at 30:15-18 (Converse).  Lewis averred that the developments "make it clear that the court is empowered to vary, it's not constrained by a guideline sentence or even by a proportionate reduction," and that, accordingly, Lewis would "ask for the chance to more fully develop matters at sentencing that I have alluded to here that go to 3553 factors."  Tr. at 30:15-23 (Converse).  The United States responded that the Court's MOO indicates it is not tethered to the Guidelines range and that the Court did not constrain itself, considering all of the 18 U.S.C. § 3553(a) factors in determining

whether to reduce Lewis' sentence below the bottom of the Guidelines range.  See Tr. at 31:10-22 (Spiers).

Lewis also argued that, in footnote 20 of the Court's MOO, the Court expressed discomfort and displeasure with "the three level reduction that was just stipulated to without any explanation." Tr. at 34:1-5 (Converse).  Lewis explained that the variance related to a "dispute about some of Mr. Lewis' predicate offenses," and expressed that he would "like to develop [that matter] at a resentencing . . . ."  Tr. at 35:1-7 (Converse).  Lewis requested that the Court reconsider its findings whether First Step Act motion hearings are § 3582(c)(2) hearings and whether Dillon and the Guidelines constrain the Court.  Lewis further beseeched the Court to remove from the MOO the references to the First Step Act being a law that lowers the Guidelines range, "and that the sentencing commission has done certain things or not done certain things in response to the lowered guideline range, which doesn't exist," and, "after that, we'd ask for a hearing where we could present additional material."  Tr. at 36:5-16 (Converse).  Lewis suggested that "perhaps the court will find that if not a full-blown plenary sentencing . . . there is a right to [allocute] at it."  Tr. at 36:21-23 (Converse).

The Court expressed that it would likely be unable to issue an opinion on the Motion immediately.  See Tr. at 37:11-12 (Court).  The United States remarked that the Court, in its MOO, took into consideration "[t]hat the defendant had originally benefitted by 74 months by an erroneous calculation of the Guidelines."  Tr. at 38:8-11 (Spiers).  The Court agreed "that was a big factor. . . .  [T]he practices at that point of people just agreeing to a . . . sentence that was not

correct . . . and then the district judges going along with it.  I thought that was a significant factor"

in the sentencing determination.  Tr. at 38:13-23 (Court).

### 3. The Sentencing Memorandum.

Lewis filed a Sentencing Memorandum on June 10, 2019 (Doc. 182)("Sentencing Memo.".

Lewis identifies each of the factors "which put . . . downward pressure on the guideline sentence."

Lewis' Sentencing Memo at 1.  Lewis summarizes those factors with bullet points:

- Remained in contact with his
  children; lower recidivism rate
  when stay in contact with children

- Sentence should provide just
  punishment to promote respect for
  the law

- Supervised release may better
  address problems, especially drugs

- Promote 3553 factors

- Parsimony clause

- Accepted responsibility

- Post conviction rehabilitation

- Not greater than necessary

- Alcohol and drug abuse better
  addressed by supervised release

- No violence

- No discipline since 2015

Sentencing Memo. at 2.  Lewis then discusses each of these factors in § 3553's context.

Lewis first examines deterrence.  See Sentencing Memo. at 2.  Lewis asserts that the Court

divided "one § 3553 factor into three different considerations in the 'upward pressure' column,"

but argues that "deterrence is just one factor under the statute." Sentencing Memo. at 2. Lewis acknowledges that some courts have interpreted the deterrence factor to include general deterrence, he argues that "there is little science to support the notion that criminals, particularly street criminals and addicts . . . pay attention to or observe the outcomes in other cases." Sentencing Memo. at 2. Lewis then synthesizes a criminology text to argue that certainty of punishment -- and not its length -- serves as the most effective deterrent. See Sentencing Memo. at 3-4 (citing Valerie Wright, Ph.D., Deterrence In Criminal Justice: Evaluating Certainty Vs. Severity Of Punishment (November 2010)).

Lewis then discusses "just punishment." Sentencing Memo. at 4. Lewis notes that the Court listed deterrence as exerting upward pressure, "whereas [Lewis] sees it as falling with the § 3553(a)(2)(A) factor, 'seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense,' which this Court listed in the downward pressure column." Sentencing Memo. at 4. Lewis argues that prison sentences vary by more than just duration, and that additionally a prisoner's location is equally determinative of the "harshness" of his sentence. Sentencing Memo. at 4-5. Lewis argues that courts should consider the nature and location of a defendant's incarceration when evaluating a sentence. See Sentencing Memo. at 5 (citing United States v. Noriega, 40 F. Supp. 2d 1378, 1379 (S.D.Fla. 1999)(Hoeveler, J.); United States v. Volpe, 78 F. Supp. 2d 76, 89 (E.D.N.Y. 1999)(Nickerson, J.)). Lewis argues that courts should, and sometimes do, issue downward departures when incarceration conditions are particularly grim. See Sentencing Memo. at 6 (citing United States v. Rodriguez, 213 F. Supp. 2d 1298, 1303 (M.D. Ala. 2002)(Thompson, J.). Lewis describes that his brother and son were murdered in 2013 and 2015, respectively. See Sentencing Memo. at 6. Lewis asserts that he was "tormented by the thought that if he'd been out, he could have done something to prevent their murders. He could

have been a father figure to his son or a mentor to his brother." Sentencing Memo. at 7. Lewis argues that these circumstances contribute to the harshness of his incarceration, rendering his punishment greater than it would otherwise appear based on duration alone.

Lewis also argues that his predicate offenses affect the just punishment factor. See Sentencing Memo. at 7.[4] On this point, Lewis disputes the PSR's characterization of his predicate offenses. Lewis asserts that the lawyer who represented him in the aggravated assault and false imprisonment charges "encouraged him to accept responsibility for everything he had been accused of" so that the matter could "all be wrapped up in one consolidated hearing" and he would "not face pretrial detention following his sentence to await trial on the issues he contested." Sentencing Memo. at 7. However, Lewis asserts that he "does contest criminal responsibility in two of those cases." Sentencing Memo. at 7. Lewis characterizes this argument not as a collateral attack on whether these offenses were properly considered in his criminal history, but rather to ask the Court to re-evaluate "how much weight to give the 'long criminal history' factor it identified." Sentencing Memo. at 7 (quoting MOO at 74). Lewis avers that the robbery charge involved $7.00,

---

[4] As a factual basis for his initial plea, Lewis provided the following information:

At the time of the incident, I was a career offender pursuant to United States Sentencing Guidelines (U.S.S.G.) § 4b1.1(b). Specifically, I had the following prior felony convictions:

I.     Aggravated Assault With A Deadly Weapon, a 4th Degree Felony, in the Second Judicial District Court, Case No. D-202-CR-9902789; and
II.    False Imprisonment, a 4th Degree Felony, and Robbery, a 3rd Degree Felony, in the Second Judicial District Court, Case No. D-202-CR-9902789.

. . . At the time of this incident, I also had a prior felony drug conviction of Possession of a Controlled Substance, a 4th Degree Felony, in the Second Judicial District Court, Case No. D-202-CR-9602246.

Plea Agreement ¶¶ 7-9, at 3-5, filed November 3, 2009 (Doc. 75).

and that the false-imprisonment victim "filed an affidavit of non-prosecution in the state case, indicating that she faced incrimination based on statements made at the time." Sentencing Memo. at 7. Lewis states that his attorney recently spoke with the alleged victim, who "confirmed that the incident did not occur as it was described in the PSR." Sentencing Memo. at 7. Regarding the aggravated assault charge discussed in the PSR ¶ 41, at 16 , Lewis asserts that the "vehicle involved was registered to the father of a young man who was a friend of Mr. Lewis. Mr. Lewis owned a similar vehicle, but was never identified by eyewitnesses as the shooter." Lewis' Sentencing Memo. at 7-8. Lewis asserts that he was innocent of this charge, and only accepted responsibility at his lawyer's urging. See Sentencing Memo. at 8.

Turning to the public-protection factor, Lewis argues that his age renders him less of a danger to the public. See Sentencing Memo. at 8. Lewis notes that the PSR covers criminal behavior beginning when Lewis was a teen and ends at his arrest at age twenty-eight. See Sentencing Memo. at 8. On this point, Lewis disputes the Court's finding "that a state probation officer went out of his way to work with Mr. Lewis; the record does not seem to support this conclusion." Sentencing Memo. at 8. Lewis then discusses neurological research suggesting that young men's brains are still developing, which causes "poor judgment, inability to plan or anticipate outcomes, and impulsivity." Sentencing Memo. at 8 (citing Am. Bar. Ass'n "Adolescence, Brain Development, and Legal Culpability," available at www.abanet.org/crimjust/juvjus/Adolescence.pdf). Lewis also cites a series of Supreme Court of the United States of America cases which describe immaturity and poor decision making in young men. See Sentencing Memo. at 9 (citing Johnson v. Texas, 509 U.S. 350, 367 (1993); Eddings v. Oklahoma, 455 U.S. 104, 115 (1982)). Lewis argues that young people are particularly susceptible to poor influences and bad decisions, resulting in reckless behavior and criminality. See

Sentencing Memo. at 9 (citing <u>United States v. C.R.</u>, 792 F. Supp. 2d 343, 496 (E.D.N.Y. 2011)(Weinstein, J.)).  Lewis also notes that the Supreme Court's abolition of the death penalty for juveniles was based on the fact that "'a lack of maturity and an underdeveloped sense of responsibility are found in young more often than adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decisions.'"  Sentencing Memo. at 10 (quoting <u>Johnson v. Texas</u>, 509 U.S. at 367).  Lewis also notes that the Supreme Court has prohibited sentences of life without the possibility of parole for juveniles.  <u>See</u> Sentencing Memo. at 11 (citing <u>Miller v. Alabama</u>, 132 S. Ct. 2455 (2012)).  Lewis argues that the Guidelines reflect this trend, advising that youth may be considered "for a departure in unusual circumstances."  Sentencing Memo. at 12 (citing USSG § 5H1.1).  Lewis points to neurological research findings that suggest that the prefrontal cortex is the last part of the brain to develop, and that this part of the brain is "'home of the so-called executive functions -- planning, settling priorities, organizing thoughts, suppressing impulses, weighing the consequences of one's actions.'"  Sentencing Memo. at 13 (quoting Claudia Wallis, "What Makes Teens Tick," <u>Time Magazine</u> (Vol. 163 No. 19, May 10, 2004)).  Lewis avers that, "while he was accumulating his criminal history that so troubles this court between the ages of eighteen and twenty-eight, [he] suffered from much the same immaturity and inability to make sound judgments that teenagers do."  Sentencing Memo. at 13.

Lewis next focuses on the avoiding-disparities factor.  Lewis notes that § 3553(a)(6) instructs courts to avoid sentencing disparities among similarly situated defendants, and that the Court listed this factor as exerting upward pressure on Lewis' sentence.  <u>See</u> Sentencing Memo. at 14.  Lewis disagrees, and argues that "many aspects of Mr. Lewis' life would suggest that a 188 month sentence is greater than necessary and disparate compared to others who are similarly

situated." Sentencing Memo. at 14. Lewis bases this point on his assertion that his predicate offense which triggered the § 851 enhancement would no longer be considered such a predicate offense. See Sentencing Memo. at 14. Lewis argues that the First Step Act modified this predicate to require a drug offense, described in 18 U.S.C. § 924(e), for which the defendant served more than twelve months in prison within the last fifteen years. See Sentencing Memo. at 14-15 (citing § 401). Lewis asserts that the statute under which he was convicted, N.M. Stat. Ann. § 30-31-23, "prescribes a maximum of eighteen months for the offense." Sentencing Memo. at 15. Lewis accordingly concludes that "an § 841 offender facing initial sentencing today could not have his sentence enhanced by this conviction." Sentencing Memo. at 15. Lewis then states, somewhat cryptically, that the Court noted, "with some displeasure, that Mr. Lewis' level had been stipulated as this earlier, and complained about the dishonesty of the prior practice of stipulating to an offense level not justified by the facts." Sentencing Memo. at 15 (not citing to the record). Lewis argues that "such a justification existed, but was not requested or offered" at his 2010 sentencing. Sentencing Memo. at 15. Lewis also argues that "there are the racial impact of last century's crack cocaine laws and police practices alluded to during the June 5 hearing (and discussed below) that the defense believes contributed to Mr. Lewis' criminal history and sentence in this case (due to the crack/powder disparity) and the realization that for a 28 year old [sic], a 262-327 range simply did not make sense and would be unfair." Sentencing Memo. at 15. Lewis then asserts that, while the First Step Act has reduced the disparity between powder and crack cocaine, "the other factors still impact." Sentencing Memo. at 16. Lewis avers that a "proportionate reduction" would provide for a sentence of 140-175 months. Sentencing Memo. at 16. Lewis then concludes by

arguing that the Court could sentence him to 161 months, which would yield a sentence of time served.  See Sentencing Memo. at 16.

Lastly, Lewis develops the argument, first made at the Hearing, that "race has had an impact on every stage of the criminal proceedings."  Sentencing Memo. at 16.  Lewis makes a systemic argument, focusing on structural inequality and disparity that disadvantages African American males.  See Sentencing Memo. at 16.  Lewis first asserts that "the trend of disproportionate incarceration of persons of color 'extends to juvenile delinquency courts.'" Sentencing Memo. at 16 (quoting Robin Walker Sterling, "Raising Race," 35 Nat'l Ass'n Crim. Def. Lawyers: Champion at 24 (April 2011)).  Lewis then quotes at length an opinion by the Honorable Jack Weinstein, United States District Judge for the United States District Court for the Eastern District of New York:

> Excessive incarceration has disproportionately affected African Americans. "Today, a generation after the triumphs of the civil rights movement, African Americans are incarcerated at seven times the rate of whites, nearly double the disparity measured before desegregation."  [Robert Perkinson, Texas Tough: The Rise of America's Prison Empire 3 (Picador 2010) (2009)].  Racial disparities in investigation, prosecution, and sentencing have long existed in the United States.

> [T]hroughout the twentieth century, both before and after developments in civil rights, blacks have been arrested, convicted, and jailed entirely out of proportion to their share of the population. Southern chain gangs ... were, to all intents and purposes, gangs of black semislaves. [B]lacks still constitute far more than their share of the prison population; they have done so for decades. Since 1933, the federal government's *Uniform Crime Reports* have kept track each year of the race of men and women arrested for serious crime. Blacks were arrested at a higher rate than whites even at the start; in 1940, 17 blacks per 1,000 were arrested, and only 6 whites. [] Arrest rates for both races have skyrocketed since 1933, but the gap remains, and it gets if anything wider. The figures for blacks are, indeed, staggering.... In 1978, 35 whites out of every 1,000 were arrested, and almost 100 out of every 1,000 blacks—nearly one out of ten.

[Lawrence M. Friedman, Crime And Punishment in American History 377-78 (1993)]. *See also* Thorsten Sellin, *The Negro Criminal: A Statistical Note,* 140 Ann. Am. Acad. Pol. & Soc. Sci. 52, 59 (1928) ("The Negro is not only convicted more frequently than whites, but he seems to receive the heavier sentences").

. . .

Racial disparity in incarceration is particularly stark with regard to drug crimes. Between 1983 and 1987, African Americans and Whites were incarcerated for such offenses in roughly equal numbers. Joan Petersilia, When Prisoners Come Home: Parole And Prisoner Reentry 29 (2003)]. Between 1983 and 1998, the population of African Americans imprisoned for drug offenses increased twenty-six times, compared to an eighteenfold increase for Hispanics and a sevenfold increase for Whites. *Id.* at 28 (citing Michael Tonry, *Malign Neglect: Race, Crime, and Punishment in America* (1995)). African Americans comprised only 11 to 12 percent of the United States population during this period. *Id.* at 28.

Among those convicted of drug offenses, racial disparities exist in both the likelihood of imprisonment and the length of imprisonment. 2004 U.S.S.C. Report 122 ("The odds of a typical Black drug offender being sentenced to imprisonment are about 20 percent higher than the odds of a typical White offender, while the odds of a Hispanic drug offender are about 40 percent higher."); *id.* at 123 ("The typical Black drug trafficker receives a sentence about ten percent longer than a similar White drug trafficker. This translates into a sentence about seven months longer."). *Cf. id.* at 129 (African Americans are less likely than defendants of other races to receive downward departures under the sentencing guidelines).

Lewis; Sentencing Memo. at 17-18 (quoting <u>United States v. Bannister</u>, 786 F. Supp. 2d 617, 652-53 (E.D.N.Y. 2011)). Lewis then argues that "prior record enhancement practices have significant unintended consequences, including exacerbating race disparities." Sentencing Memo. at 18. Lewis does not, however, tie these statistics to his case or experience, and does not show specifically how his criminal history category is affected by his race.

Lewis concludes, arguing that "a person sentenced today would not face the same § 851 enhancement" he received. Sentencing Memo. at 19. Lewis also argues that, because: (i) his criminal history is less serious than it appears; (ii) he lacks any discipline in prison over the past five years; (iii) "the devastating blows he suffered in prison with the deaths of his son and brother";

and (iv) he has matured throughout his time in prison, the Court should sentence Lewis to 161 months.  Sentencing Memo. at 18-19.

### 4. **The Response.**

The United States filed a response.  See Response by the United States to the Defendant's Sentencing Memo. at 1, filed June 12, 2019 (Doc. 184)("Response").  The United States begins by observing that Lewis' requested sentence of 161 months is "27 months less than the low-end of the" USPO calculation of 188 to 235 months.  Response at 1.  The United States also notes that Lewis' request is twenty-seven months shorter than the sentence imposed by Judge Hansen, which the Court affirmed in its MOO.  See Response at 1-2.  Accordingly, the United States opposes Lewis' request.

The United States asserts that the FSA reduced the "statutorily authorized imprisonment penalty" for Lewis' conviction to between ten and thirty years.  Response at 2.  The United States then describes the USPO's calculation, which began with a stipulated offense level of 34 and ended with an offense level of 31 after a three-level reduction under USSG § 3E1.1 (Acceptance of Responsibility).  See Response at 2 (citing Plea Agreement Plea Agreement ¶¶ 7-9, at 3-5, filed November 3, 2009 (Doc. 75)).  The United States asserts that, under the 2009 Guidelines, this offense level, for a career offender at a criminal history category VI, yielded a sentence of 188 to 235 months.  See Response at 2-3 (citing PSR ¶ 107, at 39).  The United States then avers that the USPO, in its FSA Memorandum, considered the effect of the FSA on Lewis' sentence and accordingly revised the offense level to 30.  See Response at 3 (citing Memorandum at 1, filed March 1, 2019 (Doc. 158)("USPO Memorandum")). Lewis remained a career offender in the USPO's eyes, however, rendering Lewis ineligible for a sentencing reduction.  See Response at 3

(citing USPO Memorandum at 2). The United States asserts that the Court agreed with the USPO calculation in its MOO. See Response at 4 (citing MOO at 69).

The United States then turns to the § 3553(a) factors. See Response at 4. The United States argues that "[n]one of the factors listed in § 3553(a) warrant a variance from the Sentencing Guidelines." Response at 5. Regarding avoiding sentencing disparities, the United States avers that this factor "weighs heavily in favor" of keeping Lewis' sentence within the Guidelines. Response at 5. The United States notes that, in United States v. Crews, 2019 WL 2248650 (W.D. Pa. May 24, 2019)(Conti, J.), the Honorable Joy Flowers Conti, United States District Judge for the United States District Court for the Western District of Pennsylvania, declined to reduce the defendant's 188-month sentence and instead reduced the period of supervised release. See Response at 5-6 (citing 2019 WL 2248650, at *6-7). The United States also summarizes United States v. Russo, 2019 WL 1277507 (D. Neb. Mar. 20, 2019)(Smith Camp, J.), in which the Honorable Laurie Smith Camp, United States District Judge for the United States District Court for the District of Nebraska, declined to reduce a career offender's 188-month sentence after concluding that the First Step Act requires only retroactive application of the reduced crack-cocaine sentences, and not a full re-sentencing under all changed laws and Guidelines. See Response at 6 (citing 2019 WL 1277507 at *1). The United States avers that Judge Smith Camp declined to reduce the defendant's sentence in part because it would be unfair to other offenders serving sentences for non-crack-cocaine-related offenses. See Response at 6 (citing 2019 WL 1277507, at *1). The United States concludes that the need to avoid sentencing disparities outweighs Lewis' argument that § 851 should no longer apply, as it would "'work an injustice to offenders sentenced in the past who did not have a crack cocaine conviction qualifying for sentence

reduction pursuant to the Fair Sentencing Act of 2010.'"  Response at 6 (quoting <u>United States v.</u> <u>Russo</u>, 2019 WL 1277507, at *1).

Regarding the need to impose a just punishment, the United States argues that "this was not one of the more familiar cases where a simple, unarmed transporter in a drone-like fashion on a Greyhound bus or an Amtrak train is possessing with intent to distribute narcotics."  Response at 7.  Instead, the United States asserts that "the previously felony convicted Defendant was found by law enforcement in possession of multiple drug bundles, cocaine, cocaine base, marijuana and a loaded firearm within arm's reach."  Response at 7.  Accordingly, the United States concludes that the Court must evaluate "not only . . . the offense but also . . . the Defendant" in order to impose a punishment "sufficient to deter the Defendant and others from criminal conduct."  Response at 7.  The United States avers that lengthy prison sentences deter similar conduct, because the "defendant will weigh the risk possible [sic] consequences," and an "insignificant irritant" renders it more likely that others will "commit the act."  Response at 8.  The United States asserts, in an empirical argument, that a lengthy "sentence gives meaning to general deterrence because the word of a heavy sentence will likely travel on the criminal street and forewarn others."  Response at 8.

The United States identifies that most of the factual disagreements it has with Lewis concern his criminal history.  <u>See</u> Response 8.  The United States asserts that Lewis "has long been known to law enforcement," and that he "engaged in a steady succession of criminal activity that has witnessed many convictions and arrests" between 1997 and 2007.  Response at 8.  The United States argues that Lewis' criminal history "includes serial acts of violence."  Response at 8.  Responding to Lewis' discussion of neurological research of adolescent impulsivity, the United States argues that Lewis' "criminal history is largely characterized not so much by being the

obedient servant of impulse as it is characterized by thought-out act of retribution or the pursuit of personal pleasure of monetary gain." Response at 9. The United States further asserts that "any youthful relationship with impulse and immaturity, if valid, would give way to some reflection about the consequences of his actions." Response at 9. The United States does not, however, refer specifically to any of Lewis' predicate offenses or dispute the neurological research on which Lewis bases his argument.

Last, the United States turns to Lewis' arguments concerning racial inequity in the criminal justice system. See Response at 10. The United States argues that Lewis has not specifically shown how systemic disparities affected his criminal history. See Response at 10. Instead, the United States asserts that Lewis' "criminal record carries a strong negative momentum and unfortunately underscores that [Lewis] has reflexively again and again chosen to opt for a life of crime." Response at 10. The United States then briefly posits "that a number of universally well-regarded black thinkers, scholars, and commentators such as Thomas Sowell, Shelby Stelle, Walter Williams, and Jason L. Riley, for instance, do not subscribe to the theory of race having a discriminating impact on every stage of the criminal justice system." Response at 10. The United States does not, however, cite specific work nor specific statistics rebutting Lewis' assertions.

The United States then reiterates its assertion that Lewis' 188-month sentence is at the "low-end" of the Guidelines, reflects the "seriousness of his offense," promotes respect for the law, and provides a just punishment. Accordingly, the United States requests that the Court preserve Lewis' 188-month sentence. See Response at 11.

**5.** **The Supplement.**

On November 5, 2019, while the Court was writing this Memorandum Opinion and Order, Lewis filed additional briefing on developments in this area's caselaw. See Supplemental

Authority Regarding the Ability to Vary, filed November 5, 2019 (Doc. 188)("Supplement"). In his Supplement, Lewis seeks to "notif[y] this Court of caselaw developments since his May 15, 2019[,] motion to reconsider[.]" Supplement at 1. Lewis argues that, since he filed the Motion in May, 2019, "numerous cases have affirmed a Court's ability to impose a variance when resentencing a defendant pursuant to Section 404 of the First Step Act." Supplement at 1. Lewis then compiles sixteen cases that he asserts support this contention and provides, for each case, brief summaries. See Supplement at 1-8.

Lewis first notes United States v. Martin, No. 1:05-CR-21, 2019 WL 4862055 (N.D. W. Va. Oct. 2, 2019)(Keeley, J.). See Supplement at 1-2. In that case, the defendant was convicted in 2006 of conspiring to distribute and aiding and abetting the distribution of cocaine base, as well as distribution of cocaine base and use of a firearm in relation to a drug trafficking offense. See 2019 WL 4862055, at *1. The defendant was initially sentenced to 270 months incarceration but, in 2010, on remand from the United States Court of Appeals for the Fourth Circuit, the district court varied from a guideline range of life imprisonment for the defendant's relevant conduct and sentenced him again to a total of 270 months. See 2019 WL 4862055, at *1. In 2019, the defendant sought sentence reduction under the First Step Act, which the court denied, concluding that "he had previously been sentences in accord with Sections 2 and 3 of the Fair Sentencing Act of 2010 and, in any event, would still have a guidelines range of life imprisonment." United States v. Martin, 2019 WL 4862055, at *1. On reconsideration, the court concluded that the defendant's 2010 resentencing was imposed before the Fair Sentencing Act was enacted, and so the defendant was eligible for relief under the First Step Act. See 2019 WL 4862055, at *3. The court declined to reduce the defendant's sentence to time served or, alternatively, 210 months, because such a sentence would not comport with § 3553(a)'s policy goals in light of his use of a firearm and the

amount of cocaine base he distributed. See 2019 WL 4862055, at *4. The court nonetheless reduced the defendant's sentence to 240 months, based on the defendant's good behavior, educational achievements in prison, and health issues. See 2019 WL 4862055, at *3-5. Lewis argues that the court "would 'not take into account' the relevant conduct drug weight (11.23 kilograms) because it did not base the statutory penalties on relevant conduct in 2011," and that the court "applied section 3553(a), and considered post-sentencing conduct." Supplement at 2 (quoting United States v. Martin, 2019 WL 4862055, at *3).

Lewis next turns, without comment, to United States v. Tate, No. 07-CR-259(1), 2019 WL 4674044 (D. Minn. Sept. 25, 2019), see Supplement at 2, in which the defendant sought resentencing under the First Step Act of a 2007 conviction for conspiracy to distribute at least fifty grams of crack cocaine, see 2019 WL 4674044, at *1. The defendant was initially sentenced to 211 months' imprisonment, a downward variance from the relevant guidelines' low end based on "§ 3553(a) factors; [the defendant's] criminal history; [his] position in relation to his co-defendants"; the sentencing "disparities between crack and cocaine"; and to reflect a reasonable graduated sanction considering [he] had "never served a particularly long sentence before." 2019 WL 4674044, at *1. Under the First Step Act, the defendant's guideline sentence ranged from 188 to 235 months (down from 262-327 months), but the court reduced the defendant's sentence to 180 months "in light of the new guidelines range, as well as the § 3553(a) factor[.]" 2019 WL 4674044, at *3.

Lewis then cites United States v. Jackson, No. 8:00-CR-346-T-17, 2019 WL 4222686 (M.D. Fla. Sept. 5, 2019)(Kovachevich, J.), see Supplement at 2, in which the defendant sought resentencing, under the First Step Act, of a 2002 life sentence for conspiracy to distribute and distribution of eighty-eight grams of cocaine base, see 2019 WL 4222686, at *1. The defendant's

mandatory minimum sentence was life imprisonment, based on his two prior qualifying felonies under 21 U.S.C. § 851. See 2019 WL 4222686, at *1. The First Step Act rendered the defendant's guideline sentence range 360 months to life. See 2019 WL 4222686, at *2. Acknowledging that the First Step Act "does not entitle a defendant to a plenary sentence, but it also 'does not impose any artificial guideline limits on a reviewing court,'" the court reduced the defendant's sentence to time served, because "the guidelines sentence of 360 months is unnecessary to meet the objectives of sentencing[.]" 2019 WL 4222686, at *5.

Lewis also summarizes United States v. Brown, No. 07-cr-20195-01, 2019 WL 4126555 (E.D. Mich. Aug. 30, 2019)(Ludington, J.), see Supplement at 2-3, in which the defendant was sentenced to 250 months -- a twelve-month variance from his guideline range of 262-327 months -- in 2008 for conspiracy to distribute fifty grams or more of cocaine base, see 2019 WL 4126555, at *1. The court concluded that 18 U.S.C. § 3582(c)(1)(B) "is the proper vehicle for implementing" the First Step Act, that the First Step Act "does not require plenary resentencing," and analyzed the defendant's First Step Act motion under the § 3553(a) factors. 2019 WL 4126555. at *3. The parties acknowledged that the First Step Act did not affect the defendant's guideline range, but the court reduced the defendant's sentence to 230 months in light of his lower mandatory minimum, and his "post-conviction conduct [as] a relevant factor under" § 3553(a). 2019 WL 4126555, at *5.

Lewis then directs the Court to United States v. Miles, No. 3:02-CR-548-33, 2019 WL 4024776 (D.S.C. Aug. 27, 2019)(Currie, J.). See Supplement at 3. In United States v. Miles, the defendant was sentenced to 360 months on an ambiguous jury verdict that did not specify whether he was guilty of conspiracy involving five kilograms or more of cocaine or fifty grams or more of cocaine base. See 2019 WL 4024776, at *2. Applying the rule of lenity, the court first concluded

that the defendant's conviction related to cocaine base, rendering him eligible for relief under the First Step Act.  See 2019 WL 4024776, at *2.  The court then agreed that § 3582(c)(1)(B) is the applicable provision to implement the First Step Act such that the defendant was not entitled to full resentencing.  See 2019 WL 4024776, at *2.  The court noted that, although the defendant's mandatory minimum sentence was reduced from a sentence of ten years to life, to a sentence of five to forty years, the defendant's current sentence "is at the bottom of his current guideline range of 360 to 480 months."  2019 WL 4024776, at *3.  The defendant's criminal history category, however, would have been reduced had he been sentenced in 2019, leading the court to conclude that the defendant "did not have a serious prior criminal record."  2019 WL 4024776, at *4.  Considering the defendant's age (forty-seven), educational achievements in prison, positive disciplinary record, and active involvement in his family members' lives, the court reduced the defendant's sentence to 295 months.  See 2019 WL 4024776, at *5.

Lewis next cites United States v. Robinson, No. 02-CR-227, 2019 WL 3867042 (D. Md. Aug. 15, 2019)(Messitte, J.), see Supplement at 4, in which the defendant sought resentencing, under the First Step Act, of a 2003 sentence of 360 months' imprisonment for possession with intent distribute 312 grams of crack cocaine, see 2019 WL 3867042, at *1-2.  In 2003, the defendant's offense level was 38 and his criminal history category was VI, resulting in a sentencing range of 360 months to life imprisonment, but the sentencing court reduced the defendant's sentence to 264 months' imprisonment following the Supreme Court's decision in United States v. Booker.  See 2019 WL 3867042, at *2.  The defendant's sentence was further reduced to 210 months' imprisonment in 2009, following Amendment 706 to the Guidelines.  See 2019 WL 3867042, at *1.  On the defendant's First Step Act motion, the court first adopted what it termed the "elemental approach," to determine that the defendant's underlying conviction qualifies as a

covered offense under the First Step Act. 2019 WL 3867042, at *2-3. The court looked only at the statute under which the defendant was convicted and not at the fact that the amount of drugs the defendant possessed would have subjected him to the same sentencing range regardless of the First Step Act's application. See 2019 WL 3867042, at *3. The court first rejected the United States' argument that the defendant was ineligible for a First Step Act reduction because he was initially sentenced to a below-Guidelines sentence, noting that several other district courts had reduced similarly situated defendants' sentences. See 2019 WL 3867042, at *5 (compiling cases). Turning to the § 3553(a) factors, the court noted that, while the defendant "was convicted of possessing a sizable quantity of cocaine with intent to distribute, his crimes were not violent, nor did he possess a firearm when committing them." 2019 WL 3867042, at *6. The court also opined that, as the defendant had already served seventeen years of his sentence, a twenty-two-month reduction "can hardly be characterized, as the Government does, as a 'windfall'" for the defendant. 2019 WL 3867042, at *6. Accordingly, the court concluded that the defendant's seventeen-year imprisonment "satisfy[ied] the twin goals of deterring future criminal behavior and protecting the broader community from harm," and reduced the defendant's sentence by twenty-two months. 2019 WL 3867042, at *6.

Lewis also cites United States v. Gordon, No. 3:04-CR-00023-01, 2019 WL 3824250 (W.D. Va. Aug. 14, 2019)(Jones, J.). See Supplement at 4. In United States v. Gordon, the defendant was convicted in 2004 of illegal reentry and possession with intent to distribute 1.5 kilograms of cocaine base, which, combined with his career offender status, resulted in a 480-month sentence. See 2019 WL 3824250, at *2. On the defendant's First Step Act motion, the court considered the defendant's clean disciplinary record since 2010, his completion of a high-school degree in prison, the fact that he would likely be deported upon release from prison, and

that he was forty-nine years old to conclude that the defendant's "sentence should be somewhat reduced." 2019 WL 3824250, at *5-6. The court did not expressly consider the § 3553(a) factors, but reduced the defendant's drug sentence from 360 months to 262 months. See 2019 WL 3824250, at *6.

Lewis next points the Court to United States v. Askins, No. 2:02-CR-00645, 2019 WL 3800227 (D. Ariz. Aug. 6, 2019)(Bolton, J.). See Supplement at 4-5. In United States v. Askins, the defendant was convicted in 2002 of possession with intent to distribute five grams of cocaine base, for which he was sentenced to 262 months' imprisonment. See 2019 WL 3800227, at *1. The court first concluded that the First Step Act does not call for plenary resentencing, which the court characterizes as "significant for individuals who, like Defendant, were originally sentenced as career offenders and excluded from prior Guidelines reforms." 2019 WL 3800227, at *6-7. "These once-overlooked defendants," the court opined, "'now have an opportunity to obtain relief under the First Step Act even though their technical guideline range remains unaffected.'" 2019 WL 3800227, at *7 (quoting United States v. Boulding, 379 F. Supp. 3d 646, 653 (W.D. Mich. 2019)(Jonker, J.)). The court accordingly analyzed the defendant's entitlement to a sentence reduction "by considering not only his nearly identical Guidelines range as a career offender, but also the revised statutory range under the Fair Sentencing Act, the 18 U.S.C. § 3553(a) factors, and any amendments to the Guidelines range for the underlying crack offense." 2019 WL 3800227, at *7. The court noted that the Fair Sentencing Act amendments lower the defendant's statutory sentence range of five to forty years' imprisonment to zero to twenty years' imprisonment. See 2019 WL 3800227, at *7. The court also noted that, but for the defendant's career-offender status, his sentence would be "dramatically reduced to 92 to 115 months." 2019 WL 3800227, at *7. The court nonetheless concluded that the Guidelines overstated the

defendant's criminal history and reduced the defendant's sentence to time served -- a roughly 30-month reduction -- which the court asserted "accounts for the § 3553(a) factors." 2019 WL 3800227, at *7.

Lewis turns to United States v. Buggs, No. 1:09-cr-147-2, 2019 WL 3282656 (W.D. Mich. July 22, 2019)(Jonker, J), see Supplement at 5, in which the defendant was sentenced in 2009 to 190 months' imprisonment for firearm and cocaine base offenses as a twenty-three-year-old career offender, see 2019 WL 3282656, at *1. The Guideline range for the defendant's initial sentence and criminal history category was 262 to 327 months for the cocaine offense, but the sentencing court varied downward, to 130 months, to reflect what the defendant's sentence would have been absent his career offender status. See 2019 WL 3282656, at *3. In 2010, the defendant's sentence was further reduced after the United States moved for a downward departure based on the defendant's substantial post-sentencing assistance, resulting in a ten-month reduction of the cocaine offense's sentence to the then-mandatory minimum of 120 months. See 2019 WL 3282656, at *4. The court then summarized its view of the First Step Act:

> "[U]nlike earlier rounds of retroactive crack or other drug sentencing relief, the First Step Act does not impose any artificial or guideline limits on a reviewing court. These earlier rounds of retroactive reduction proceeded under 18 U.S.C. § 3582(c)(2) based on Sentencing Commission guideline reductions and were therefore subject to the limitations built into that section. The First Step Act is different. The Sentencing Commission has nothing to do with it."

2019 WL 3282656, at *6 (quoting United States v. Boulding, 379 F. Supp. 3d at 653). The court asserted that, to consider whether to reduce a sentence pursuant to the First Step Act, courts should consider the § 3553(a) factors, the Fair Sentencing Act's revised statutory ranges, any relevant Guideline amendments, and the defendant's post-sentencing conduct. See 2019 WL 3282656, at *7. The court then compared the Guideline ranges for the defendant's conviction at time of sentencing with that under the First Step Act and concluded that the Guideline ranged decreased

from a range of 262 to 327 months to a range of 188 to 235 months, which still surpassed the defendant's actual sentence. See 2019 WL 3282656, at *7. The court observed, however, that, were the defendant sentenced anew in 2019, he would not receive the career offender enhancement. See 2019 WL 3282656, at *9. The court ultimately relied heavily on the defendant's post-sentencing conduct -- his completion of drug abuse programs and some academic study -- as well as the potential removal of the defendant's career offender status, to reduce the defendant's sentence for his cocaine offense from 120 months to 84 months. See 2019 WL 3282656, at *10. The court also expressly relied on the defendant's 60-month consecutive sentence for his related firearm offense, which meant that the defendant would remain imprisoned regardless of the court's use of the First Step Act, mitigating any factors counseling against sentencing reduction. See 2019 WL 3282656, at * 3 n.3, *10.

Lewis also cites to United States v. Ballinger, No. 2:09-CR-105, 2019 WL 3292156 (E.D. Tenn. July 22, 2019)(Greer, J.), see Supplement at 5, in which the defendant was sentenced to 151 months' imprisonment for possession with intent to sell fifty grams or more of cocaine base as a career offender, see 2019 WL 3292156, at *1. The sentencing court concluded that the offense involved 455 grams of cocaine base. See 2019 WL 3292156, at *1. On the defendant's First Step Act motion, the court first concluded that it was the conviction's statutory provision, and not the defendant's actual conduct, that determined the defendant's eligibility under the First Step Act; although the defendant actually possessed 455 grams of cocaine base, he pled guilty to possessing fifty grams, such that the Fair Sentencing Act's raising of the 18 U.S.C. § 841(b)(1)(A) threshold[5]

---

[5]The Fair Sentencing Act's Section 2 increased the cocaine base quantity required to trigger § 841's enhanced penalties. Specifically, it raised the § 841(b)(1)(A) threshold from fifty grams to 280 grams, and the (b)(1)(B) threshold from five grams to twenty-eight grams. See Dorsey v. United States, 567 U.S. 260, 269 (2012). The First Step Act's Section 404(a) renders the Fair Sentencing Act's Section 2 retroactive. See First Step Act of 208, Pub. L. No. 115-391, § 404,

applied to the defendant. See 2019 WL 3292156, at *1-2 (compiling cases taking this approach). The court then, without analysis or citation to § 3553(a), reduced the defendant's sentence to time served. See 2019 WL 3292156, at *4.

Lewis cites United States v. Henderson, 399 F. Supp. 3d 648 (W.D. La. 2019)(James, J.), see Supplement at 6, in which the defendant was convicted in 2005 of conspiracy to distribute and distribution of more than fifty grams of cocaine base, see 399 F. Supp. 3d at 650. Although a jury concluded that the defendant was responsible for 253.2 grams of cocaine base, the defendant's PSR concluded that the defendant was accountable for "at least 11.76 kilograms of cocaine base." 399 F. Supp. 3d at 651. With a total offense level of 38 and a criminal history category of III, the defendant was sentenced to 296 months' imprisonment, the low end of his Guideline range of 292 to 365 months. See 399 F. Supp. 3d at 651. On the defendant's First Step Act motion, the United States argued that, because the PSR found the defendant responsible for more than eleven kilograms of cocaine base, he was ineligible for a First Step Act sentence reduction. See 399 F. Supp. 3d at 652. "In other words, the government contends it is the offense conduct, and not the statute underlying a defendant's conviction and penalty that determines eligibility under the First Step Act." 399 F. Supp. 3d at 652. Applying the rule of lenity, the court rejected the United States' argument and concluded that the First Step Act's phrase "'a violation of a Federal criminal statute, the *statutory* penalties for which were modified'[,] would be redundant if 'statutory' modified 'statute' rather than 'violation.'" 399 F. Supp. 3d at 653 (quoting First Step Act of 208, Pub. L. No. 115-391, § 404, 132 Stat. 5194)(emphasis in United States v. Henderson and not in statute). The court concluded that the United States' interpretation would violate "the constitutional rule that any fact increasing a mandatory minimum must 'be submitted to the jury and found beyond a

---

132 Stat. 5194.

reasonable doubt.'"  399 F. Supp. 3d at 654 (quoting <u>Alleyne v. United States</u>, 570 U.S. 99, 112 (2013)).  The court then determined that, were the defendant sentenced in 2019, he would not receive the prior drug offense enhancement, and his Guidelines sentence range would be 235 to 293 months' imprisonment.  <u>See</u> 399 F. Supp. 3d at 656.  The court noted that the defendant had received "only two incident reports" in prison,  the defendant's criminal record revealed no violent behavior, and the defendant had a supportive family and job prospects.  399 F. Supp. 3d at 656.  The court held that "a non-guideline sentence is warranted" in light of the § 3553(a) factors, and reduced the defendant's sentence to time served -- fourteen years.  399 F. Supp. 3d at 657.

Lewis turns to <u>United States v. Garrett</u>, No. 1:03-CR-00062-SEB-DML, 2019 WL 2603531 (S.D. Ind. June 25, 2019)(Barker, J.), <u>see</u> Supplement at 7, in which the defendant was convicted in 2003 of possession with intent to distribute fifty grams or more of cocaine base and possession of a firearm with intent to distribute, which, along with the defendant's career offender status, subjected the defendant to a statutory mandatory minimum life sentence, <u>see</u> 2019 WL 2603531, at *1.  The firearm offense carried a 60-month sentence, mandatorily imposed to run consecutively.  <u>See</u> 2019 WL 2603531, at *1.  In 2017, President Obama commuted the defendant's sentence to a total of 360 months.  <u>See</u> 2019 WL 2603531, at *1.  The court first rejected the United States' argument that the defendant was ineligible for sentencing reduction, because the First Step Act's application did not alter the defendant's guideline range.  <u>See</u> 2019 WL 2603531, at *3.  "The fact that Mr. Garrett's guideline range remains unchanged does not foreclose a reduction of his sentence, at least where he was sentenced to the mandatory minimum and the mandatory minimum sentence was thereafter reduced by section 2 of the Fair Sentencing Act." 2019 WL 2603531, at *3 (citing <u>United States v. Bean</u>, No. 1:09-cr-143, 2019 WL 2537435, at *5-6 (W.D. Mich. June 20, 2019)(Jonker, J.)).  The court reasoned that the First Step Act's text

contains "no such limiting language[.]"  2019 WL 2603531, at *3.  The court then rejected the

United States' argument that the court should rely on the defendant's PSR, which concluded that

the defendant was responsible for 315 grams of cocaine base, and "decline[]d to assume, as the

government conjectures, that Mr. Garrett would have been charged and pleaded guilty or been

found guilty at trial of possession with the intent to distribute more than 280 grams of cocaine

base." 2019 WL 2603531, at *3.  Acknowledging that the defendant's Guidelines range remained

unchanged and that the defendant's commuted sentence is below the Guidelines range, the court

said that the Fair Sentencing Act's reduced mandatory minimum reflects "'Congress's judgment

that shorter prison sentences adequately reflect the serious of crack cocaine offenses.'"  2019 WL

2603531, at *3 (quoting United States v. Biggs, 2019 WL 210226, at *4 (N.D. Ill. May 15,

2019)(Lefkow, J.)).  The court then noted that the defendant had completed BOP drug abuse

counseling programs, completed his GED, and completed several "character-building courses" and

"classes focused on achieving cognitive, vocational, and interpersonal skills."  2019 WL 2603531,

at *4.  The court "acknowledge[d] that Mr. Garrett's violent history remains a source of concern,"

but said that "the crime he committed did not involve violence."  2019 WL 2603531, at *4.  The

court then reduced the defendant's drug offense sentence from 360 total months to "180 months

on [the drug trafficking offense], plus 60 months consecutive on [the firearm offense], minus an

additional 24 months to acknowledge his significant success in post-conviction rehabilitation" to

a total sentence of 216 months.  2019 WL 2603531, at *4.  The court described this sentence as

"sufficient but not greater than necessary to accomplish the sentencing goals in § 3553(a), taking

into account the resent changes in the sentencing statutes."  2019 WL 2603531, at *4.

Lewis also cites United States v. Martin, No. 03-CR-795, 2019 WL 2571148 (E.D.N.Y.

June 20, 2019)(Korman, J.), see Supplement at 7, in which the defendant pled guilty in 2006 to

possession with intent to distribute fifty grams or more of cocaine base, see 2019 WL 2571148, at

*1.  Although the indictment specified a drug quantity of fifty grams or more, in violation of §

841(b)(1)(A)(iii) (2006), the defendant stipulated in his plea agreement that "his sentence shall be

calculated based on a drug type and quantity of at least 1.5 kilograms of cocaine base."  2019 WL

2571148, at *1.  The court then rejected the United States' argument that the defendant's actual

conduct -- rather than the statutory provision to which he plead guilty -- determines his eligibility

for First Step Act relief.  See 2019 WL 2571148, at *2.  The court opined that "a majority of district

courts" hold that "'it is the statute of conviction, not actual conduct, that controls eligibility under

the First Step Act.'"  2019 WL 2571148, at *2 (quoting United States v. Martin, No. 03-CR-795

(BMC), 2019 WL 1558817, at *3 (E.D.N.Y. April 10, 2019)(Cogan, J.), vacated (April 22, 2019)).

The court acknowledged the ambiguity of the First Step Act's § 404, but asserted that the United

States' "reading premises the availability of a sentence reduction on uncharged conduct not

considered by the [] jury," in violation of Alleyne v. United States, 570 U.S. at 103.  2019 WL

2571148, at *2.  Further tipping the scales in the defendant's favor, the court stated, is the rule of

lenity, which "'requires a sentencing court -- when faced with an actual ambiguity over which of

two penalties should apply -- to select the lesser penalty.'"  2019 WL 2571148, at *2 (quoting

United States v. Fields, 113 F.3d 313, 325 (2d Cir. 1997)).  The court rejected the United States'

argument that "the term 'statutory' in 'a violation of a Federal criminal statute, the *statutory*

penalties for which were modified,' would be redundant if 'statutory modified 'statute' rather than

'violation.'"  2019 WL 2571148, at *3 (quoting First Step Act § 404)(emphasis in United States

v. Martin and not in First Step Act § 404).  "Not so," the court stated, concluding instead that the

§ 404's use of the term "statutory" "simply indicates that the penalties modified must be the

penalties prescribed by statute, as opposed to a change in the Sentencing Guidelines, for example."

2019 WL 2571148, at *3.  The court accordingly determined that the defendant was eligible for First Step Act relief.  See 2019 WL 2571148, at *3.

The defendant in United States v. Martin was initially sentenced to 240 months, the mandatory minimum and well below the then-Guidelines range of 360 months to life imprisonment.  See 2019 WL 2571148, at *4.  Under the 2019 Guidelines, the defendant's sentence would range between 210 to 293 months.  See 2019 WL 2571148, at *4.  The court noted that the defendant's co-defendant had seen his sentence reduced to time served, such that § 3553(a) counseled a reduction in the defendant's sentence to avoid sentencing disparities.  See 2019 WL 2571148, at *4.  The court then observed that the defendant had not received any disciplinary infractions for seven years, had "completed numerous educational courses," and had "maintained relationships with his family, as evidenced by the various letters submitted by his daughters and their mother."  2019 WL 2571148, at *4.  The court then concluded, without further explanation, that a reduced sentence of 180 months was enough to comply with § 3553(a)'s sentencing goals.  See 2019 WL 2571148, at *5.

Last, Lewis cites United States v. Stone, No. 96-403, 2019 WL 2475750 (N.D. Ohio June 13, 2019)(Nugent, J.).  See Supplement at 7-8.  In United States v. Stone, the defendant was convicted by jury in 1997 of a rash of cocaine-base offenses.  See 2019 WL 2475750, at *1.  The jury did determine of the amount of drugs for which the defendant was responsible, but the sentencing court concluded that he was responsible for fifty grams of cocaine base and more than five kilograms of cocaine.  See 2019 WL 2475750, at *1.   The defendant's PSR, however, calculated that the defendant should be held responsible for 492 kilograms of cocaine base.  See 2019 WL 2475750, at *2.  The defendant was sentenced to life imprisonment and had served twenty-two years when he moved for sentencing reduction under the First Step Act.  See 2019 WL

2475750, at *1. The defendant argued that the court should apply the intervening rule from Apprendi v. New Jersey, 530 U.S. 466 (2000), see 2019 WL 2475750, at *2, which held that any fact that increases a defendant's sentence beyond the statutory maximum must be proven beyond a reasonable doubt, see 530 U.S. at 490. The court agreed and, in light of the lack of express jury findings regarding the drugs' quantity, the court adopted "the lowest drug quantity category when considering Mr. Stone's new sentence under the First Step Act." 2019 WL 2475750, at *3. The court then reduced the defendant's sentence to 360 months in light of its presumption that the defendant's offense involved less than twenty-eight grams of cocaine base. See 2019 WL 2475750, at *3. United States v. Stone thus involved an unusual procedural quirk, as the sentencing court did not instruct the jury to determine the amount of cocaine base for which he was convicted.

Lewis concludes his Supplement by noting that he anticipates "being released from prison to community confinement in June, 2020." Supplement at 8. Lewis says that his "good time was recalculated pursuant to Sec. 102 of the First Step Act," which results in an advanced release date of June 17, 2021. Supplement at 8. Lewis describes that, "due to the length of his sentence and programming he has done, he anticipates being able to spend the last year of his sentence in community confinement." Supplement at 8.

## LAW REGARDING MOTIONS TO RECONSIDER

"Motions to reconsider are proper in criminal cases even though the Federal Rules of Criminal Procedure do not specifically provide for them." United States v. Christy, 739 F.3d 534, 539 (10th Cir. 2014). See United States v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010)("None of the Rules of Criminal Procedure authorizes a generic motion to reconsider; the criminal rules lack a counterpart to the motions authorized by Fed. R. Civ. P. 50(b), 52(b), or 59, though they do

authorize some post-trial motions . . . that have features in common with motions under the civil rules."). The Tenth Circuit has held that criminal motions to reconsider are proper, because a "district court should have the opportunity to correct alleged errors in its dispositions." United States v. Christy, 739 F.3d at 539. A district court may grant a motion to reconsider "when the court has misapprehended the facts, a party's position, or the law." United States v. Christy, 739 F.3d 539 (citing Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000)). Specific grounds for reconsideration include: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." Servants of Paraclete v. Does, 204 F.3d at 1012. Motions to reconsider "should not be used to revisit issues already addressed or advance arguments that could have been raised earlier." United States v. Christy, 739 F.3d at 539.

"In the criminal context, courts ordinarily apply the same standards to motions to reconsider as those used in civil cases." United States v. Christy, 810 F. Supp. 2d 1219, 1249 (D.N.M. 2011)(Browning, J.), aff'd by, United States v. Christy, 739 F.3d 534 (10th Cir. 2014). See United States v. Rollins, 607 F.3d at 502 (stating that the Supreme Court of the United States has "concluded that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits")(citing United States v. Wilson, No. 08-cr-263-KHV, 2011 WL 1706890, at *1 (D. Colo. May 5, 2011)(Vratil, J.)(stating that, in the context of criminal cases, courts ordinarily apply the same standard for a motion to reconsider as the standard they use in civil cases); United States v. Matlack, No. 09-cr-531-WYD, 2010 WL 2682110, at *1 (D. Colo. July 1, 2010)(Daniel, C.J.)(stating that other district courts in the Tenth Circuit have relied on the standards for evaluating a motion to reconsider in the civil context when addressing motions to reconsider in the criminal context), declined to follow on other grounds by United States v. Games-

Perez, 667 F.3d 1136 (10th Cir. 2012); United States v. West, No. 01-40122-01-SAC, 2002 WL 1334870, at *1 (D. Kan. May 9, 2002)(Crow, J.)("Rarely do parties in criminal proceedings file motions to reconsider rulings on pretrial motions.  This court believes that the standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a motion to reconsider in a criminal case."); United States v. D'Armond, 80 F. Supp. 2d 1157, 1170 (D. Kan. 1999)(Crow, J.)("This court believes that the standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a motion to reconsider in a criminal case."); United States v. Ibarra, 502 U.S. 1 (1991); United States v. Dieter, 429 U.S. 6 (1976); United States v. Healy, 376 U.S. 75 (1964).

The Tenth Circuit has applied the law regarding motions to reconsider in civil cases to the criminal context.  See United States v. Christy, 739 F.3d at 539-40; United States v. Huff, 782 F.3d 1221, 1223-24 (10th Cir. 2015).  The Tenth Circuit relies on civil cases for the principles that govern motions to reconsider in the criminal context.  See United States v. Christy, 739 F.3d at 539 (applying the standard set forth in Servants of Paraclete v. Does in the criminal context); United States v. Huff, 782 F.3d at 1224 (same).  The Tenth Circuit similarly applied the Servants of Paraclete v. Does standard in reconsidering a motion to suppress in the criminal context in United States v. Huff, explaining:

> We have held that a motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law.  *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  Specific situations where circumstances may warrant reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."  *Id.*  "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed."  *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan. 1994).  We have specifically held that "[a] motion to reconsider should not be used to revisit issues already addressed or advance

arguments that could have been raised earlier." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014).

782 F.3d at 1224. The Court will thus use the same test that it has developed for motions to reconsider in the civil context for motions to reconsider in criminal cases. See <u>Anderson Living Trust v. WPX Energy Prod., LLC</u>, 312 F.R.D. 620, 642-49 (D.N.M. 2015)(Browning, J.). The Court outlines the law regarding motions to reconsider in the civil context, below.

Except where the Federal Rules of Civil Procedure specify, motions to reconsider in civil cases fall into three categories:

> First, there are motions to reconsider "filed within [twenty-eight] days of the entry of judgment," which are "treated as a motion to alter or amend the judgment under rule 59(e)" of the Federal Rules of Civil Procedure. <u>Pedroza v. Lomas Auto Mall, Inc.</u>, 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.). See <u>N.M. Health Connections v. U.S. Dep't of Health and Human Servs.</u>, 340 F. Supp. 3d 1112, 1164-75 (D.N.M. 2018)(Browning, J.)(denying motion to reconsider under rule 59(e)). Second, there are motions to reconsider "filed more than [twenty-eight] days after judgment," which are "considered a motion for relief from judgment under rule 60(b)" of the Federal Rules of Civil Procedure. <u>Pedroza v. Lomas Auto Mall, Inc.</u>, 258 F.R.D. at 462. See <u>Kruskal v. Martinez</u>, No. CIV 16-1075 JB/SCY, 2018 WL 3972910, at *9 (D.N.M. Aug. 18, 2018)(Browning, J.)(denying motion to reconsider under rule 60(b)). Finally, there are motions to reconsider "any order that is not final," which are treated as "a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion." <u>Pedroza v. Lomas Auto Mall, Inc.</u>, 258 F.R.D. at 462. See <u>Price v. Philpot</u>, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005); <u>Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.</u>, 312 F.3d 1292, 1296 n.3 (10th Cir. 2002). See <u>also</u> <u>United States v. Loera</u>, 182 F. Supp. 3d 1173, 1218-30 (D.N.M. 2016)(Browning, J.)(denying motion to reconsider rulings on a motion to suppress).

<u>Rivero v. Bd. of Regents of Univ. of N.M.</u>, No. CIV 16-0318 JB\SCY, 2019 WL 1085179, at *55 (D.N.M. March 7, 2019)(Browning, J.). While the civil rules are not expressly applicable to criminal cases, the courts have used the principles somewhat interchangeably. See <u>United States v. Christy</u>, 739 F.3d at 539-40; <u>United States v. Huff</u>, 782 F.3d at 1223-24. The civil caselaw can

inform when a motion to reconsider is appropriate in a criminal case. See <u>United States v. Christy</u>, 739 F.3d at 539-40; <u>United States v. Huff</u>, 782 F.3d at 1223-24.

1. **Motions for Reconsideration Under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.**

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment. See <u>Price v. Philpot</u>, 420 F.3d at 1167 n.9. If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b). See <u>Price v. Philpot</u>, 420 F.3d at 1167 n.9. "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved." <u>Jones v. United States</u>, 355 F. App'x 117, 121 (10th Cir. 2009)(unpublished).[6] Rule 59(e)'s time limit is now twenty-eight days from the entry of a judgment. See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends on the reasons expressed by the movant." <u>Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.</u>, 680 F.3d 1194, 1200 (10th Cir. 2011). Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e). <u>Phelps</u>

---

[6]<u>Jones v. United States</u> is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent that its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated, "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." <u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that <u>Jones v. United States</u>, 355 F. App'x 117 (10th Cir. 2009), has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d 751,

753 (10th Cir. 1989)). In other words, if the reconsideration motion seeks to alter the district

court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's

constraints. See Phelps v. Hamilton, 122 F.3d at 1324. In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives
> from a final judgment, order, or proceeding for the following reasons:
>
>> (1) mistake, inadvertence, surprise, or excusable neglect;
>>
>> (2) newly discovered evidence that, with reasonable diligence, could not
>> have been discovered in time to move for a new trial under Rule 59(b);
>>
>> (3) fraud (whether previously called intrinsic or extrinsic),
>> misrepresentation, or misconduct by an opposing party;
>>
>> (4) the judgment is void;
>>
>> (5) the judgment has been satisfied, released or discharged; it is based on
>> an earlier judgment that has been reversed or vacated; or applying it
>> prospectively is no longer equitable; or
>>
>> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Neither a rule 59 nor a rule 60 motion for reconsideration

> are []appropriate vehicles to reargue an issue previously addressed by the court
> when the motion merely advances new arguments, or supporting facts which were
> available at the time of the original motion. . . . Grounds warranting a motion to
> reconsider include (1) an intervening change in the controlling law, (2) new
> evidence previously unavailable, and (3) the need to correct clear error or prevent
> manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012. "[A] motion for reconsideration is appropriate

where the court has misapprehended the facts, a party's position, or the controlling law." Servants

of the Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling

on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms, . . . relieve a party or its

legal representative from a final judgment, order, or proceeding for the following reasons,"

including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge the

time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 348 (10th

Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant

Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. CIV 11-0103 JB/WPL, 2012 WL

869000, at *2 (D.N.M. March 8, 2012)(Browning, J.)("The Court may not extend the time period

for timely filing motions under Rule 59(e).).  "A motion under rule 59 that is filed more than 28

days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."  12

James Wm. Moore et al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations

omitted).  Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule

60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a

decision on the merits' contemplated by Rule 59(e)."  Jennings v. Rivers, 394 F.3d 850, 854 (10th

Cir. 2005)(quoting Osterneck v. Ernst & Whinney, 489 U.S. 169, 174 (1989)).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney

or when their attorney acted without their authority.  See Yapp v. Excel Corp., 186 F.3d 1222,

1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide

relief to a party . . . when the party has made an excusable litigation mistake or an attorney in the

litigation has acted without authority . . . .").  Mistake in this context entails either acting without

the client's consent or making a litigation mistake, such as failing to file or to comply with

deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake,

then it must be excusable, meaning that the party was not at fault.  See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics.  See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."

Link v. Wabash R.R., 370 U.S. 626, 633-34 (1962)(quoting Smith v. Ayer, 101 U.S. 320, 326 (1879)).   The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and has noted that "[t]hose who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences."  Gripe v. City of Enid, 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted)(quoting Pierce v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)).   "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)."  Moore et al., supra

§ 60.48[2], at 60-182.  Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").  "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'"  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863-64 (citations omitted)(first quoting Klapprott v. United States, 335 U.S. 601, 614-15 (1949); and then quoting Ackermann v. United States, 340 U.S. 193, 199 (1950)).

To warrant relief, the situation must, generally, be one beyond the control of the party moving under rule 60(b)(6).  See Ackermann v. United States, 340 U.S. at 202 ("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence.  Subsection 6 of Rule 60(b) has no application to the situation of petitioner.").  Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d at 722]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured."  Pierce, 518 F.2d at 723.  However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not

justify relief under Rule 60(b)(6).  Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45 (first alteration added and second alteration in Van Skiver v. United States).

### 2.      Motions to Reconsider Interlocutory Orders.

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment.  This confusion originates from the fact that neither the Federal Rules of Civil Procedure nor the Federal Rules of Criminal Procedure mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them.  A loose conflation in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions in civil cases -- "motion[s] to alter or amend a judgment," Fed R. Civ. P. 59(e)(emphasis added)(title case omitted) -- as "motions to reconsider,"[7] compounds that baseline confusion.  Servants of the Paraclete v. Does, 204 F.3d at 1012.

Final judgments are different from interlocutory orders.  See Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal

---

[7]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for United States Court of Appeals for the Tenth Circuit, who authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion.  204 F.3d at 1005.  He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment, which the Servants of the Paraclete v. Does standard governs; and (iii) motions to reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs. There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.
Much confusion could be avoided by using the term "motion to reconsider" exclusively to

lies.")(emphasis added). In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways. First, for the first twenty-eight days after the entry of a civil judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals. See Fed. R. App. P. 4(a)(4)(B). Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case. See Fed. R. App. P. 4(a)(4)(B). Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion. Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments. First, when a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight-day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely. Second, when a case is appealed, there is the need

refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category). These are the terms that the Federal Rules of Civil Procedure -- and other Circuits -- use to describe (ii) and (iii). The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

for a clean jurisdictional handoff from the district court to the Court of Appeals. "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982)(per curiam), superseded on other grounds by statute Fed R. App. P. 4(a)(4).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision-making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, and not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington N. R.R., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals. The district court is thus divested of jurisdiction. Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules of Civil Procedure and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204

F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules of Civil Procedure set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days. In defining the "limited review" that rule 59(e) allows a district court to conduct in the twenty-eight-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e). See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law-of-the-case doctrine in "three exceptionally narrow circumstances: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders. The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) of the Federal Rules of Civil Procedure makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are

involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, <u>any order or other decision</u>, however designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added). Rule 54(b) thus provides that a district court can freely reconsider its prior rulings, and places no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of a judgment." Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d 1217, 1225 (10th Cir. 2007). In the Tenth Circuit, "law of the case doctrine has <u>no</u> bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 (quoting <u>Avitia v. Metro. Club of Chi., Inc.</u>, 49 F.3d 1219, 1227 (7th Cir. 1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. <u>Cf. Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted).

First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[8] than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the prior ruling's overall thoroughness, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that

---

[8]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: **Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b) (bold in original). This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days. The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders. The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has on the Court's prior ruling. See 18B Charles Alan Wright, et al., Federal Practice & Procedure § 4478.1, at 695-96 (2d ed. 2002)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling than they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential

standard of review.  The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived its right to appeal the alleged error by not raising the appropriate argument.  Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard.  After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling and should try to prevent that party from having to bear the same impositions again.  Even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produced the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the party loses, and the Court denies the injunction, however, and the party moves for reconsideration, the

party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion. The Court analyzes motions to reconsider by picking up where it left off in the prior ruling and not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider. Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally. The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking. See Rivero v. Bd. of Regents of Univ. of N.M., 2019 WL 1085179, at *55-62; New Mexico v. Valley Meat Co., No. CIV 14-1100 JB/KBM, 2015 WL 9703255, at *16-22 (D.N.M. Dec. 14, 2015)(Browning, J.).

## ANALYSIS

The Court concludes that: (i) the Court did not err by not granting Lewis an in-person sentencing hearing, because the First Step Act does not require plenary resentencing and does not require a hearing at which the defendant is present; (ii) 18 U.S.C. § 3582(c)(1)(B), not

18 U.S.C. § 3582(c)(2), governs First Step Act motions for sentence reduction; (iii) the Court did not rely on the lack of a Guidelines amendment regarding the First Step Act in determining Lewis' eligibility for relief; (iv) the Court did not improperly restrict its ability to impose a sentence below the applicable Guidelines range, and conducted a thorough review of the 18 U.S.C. § 3553(a) factors in determining Lewis' recalculated sentence; (v) the 2018 Guidelines manual applies, but that the same advisory range ensues under either manual, so the Guidelines calculations remain unchanged; and (vi) the Court will not consider Lewis' race in determining his eligibility for a sentence reduction. The Court denies the Motion to the extent that it asks the Court to change Lewis' sentence.

## I.     LEWIS IS NOT ENTITLED TO AN IN-PERSON HEARING ON HIS FIRST STEP ACT MOTION FOR SENTENCE REDUCTION.

Nothing in the First Step Act entitles Lewis to a new sentencing hearing. Lewis argues that the Court erred in not granting him an in-person hearing, which he did not waive, and at which he intended to present additional information, including allocution. See Motion at 1. Lewis, however, cites no language in the statute requiring a hearing. See Tr. at 8:14-22 (Court). The Court addresses each of Lewis' points regarding his entitlement to an in-person First Step Act sentencing hearing.

Lewis cites to United States v. Bustamante-Conchas, 850 F.3d 1130 (10th Cir. 2017), for the proposition that it is plain error to deny a defendant the right to allocute. See Motion at 2. United States v. Bustamante-Conchas was not a First Step Act case, but rather addressed a defendant's right to allocution at original sentencing. See United States v. Bustamante-Conchas, 850 F.3d at 1134. In United States v. Bustamante-Conchas, the Tenth Circuit held that it is plain error "if a complete denial of allocution occurs at [a defendant's] *initial* sentencing hearing." 850 F.3d at 1134 (emphasis added). The Tenth Circuit went on to clarify that the right to allocution is

not absolute.  See 850 F.3d at 1142.  The Tenth Circuit stated, for example, that an exception to the allocution right "applies . . . on re-sentencing," specifically referencing a circumstance where a district court "makes clear -- following an initial opportunity to allocute -- that it is certain to impose a specific sentence if a defendant violates supervised release," and thereafter the defendant violates supervised release and is denied an opportunity to allocute again.  United States v. Bustamante-Conchas, 850 F.3d at 1143.  The Tenth Circuit also concluded that "remand may not be warranted if a defendant was not wholly denied the opportunity to allocute," clarifying that a plain error finding typically requires a complete denial of an opportunity to allocute at the defendant's original sentencing.  850 F.3d at 1143.  Throughout the opinion, the Tenth Circuit confines its holding to the "initial sentencing."  United States v. Bustamante-Conchas, 850 F.3d at 1144.  Nowhere in United States v. Bustamante-Conchas does the Tenth Circuit suggest that at every juncture in a defendant's case when their sentence might be affected, a district court must grant the defendant another opportunity to allocute.  Lewis does not dispute that the Honorable C. LeRoy Hansen, then-Senior United States District Judge for the United States District Court of the District of New Mexico, allowed Lewis an unrestrained opportunity to address the court at his original sentencing, and that Lewis took that opportunity.  See Transcript of Sentence Hearing at 16:14-17:15 (Lewis)(taken April 13, 2010), filed August 16, 2010 (Doc. 110)("Sentencing Tr.").  The Court disagrees with Lewis' contention that United States v. Bustamante-Conchas provides that it is plain error to deny a defendant in Lewis' circumstances the right to allocute, because United States v. Bustamante-Conchas only addresses the right to allocution at original sentencing, with Lewis had and took advantage of.  See Motion at 2.

Lewis also contends that the Court based its decision in the MOO "almost entirely on ten-year old information."  Motion at 2.  Lewis bases this assumption on the relative lengths of the

Court's discussion of the Letters in Support, and the PSR's information regarding Lewis' criminal history and offense conduct. See Motion at 2. When the Court asked why Lewis believes that the Court has not considered all of the materials which he presented to the Court, Lewis stated that the Court did not mention everything in the MOO, to which the Court responded that it read and considered all of the material that it was provided. See Tr. at 12-18 (Court). In United States v. Helton, the Fourth Circuit held that, "[a]lthough the court must base the sentence on an individualized assessment, it need not 'robotically tick through' the § 3553(a) factors." 782 F.3d at 153 (quoting United States v. Johnson, 445 F.3d 339, 345 (4th Cir. 2006)). The Tenth Circuit clarified that "[s]ection 3553(a) imposes on the district court a duty to '*consider*' a variety of important sentencing considerations. But it nowhere imposes on the court a duty to address those factors on the record . . . ." United States v. Ruiz-Terrazas, 477 F.3d 1196, 1201 (10th Cir. 2007). When "imposing a sentence within the properly calculated Guidelines range," which the Court here did, "a district court must provide, as Section 3553(c) indicates by its plain language, only 'a general statement noting the appropriate guideline range and how it was calculated.'" United States v. Ruiz-Terrazas, 477 F.3d at 1202 (quoting United States v. Lopez-Flores, 444 F.3d 1218, 1222 (10th Cir. 2006)). The Tenth Circuit noted that a more detailed sentencing explanation "can often prove beneficial, even if it is not mandatory," but that it does not "'demand that the district court cite any magic words.'" United States v. Ruiz-Terrazas, 477 F.3d at 1202 (quoting United States v. Lopez-Flores, 444 F.3d at 1222)). In United States v. Ruiz-Terrazas, the Tenth Circuit concluded that the district court indicated that it had considered the § 3553(a) factors, and that the Tenth Circuit could discern a "clear explanation of the sentence" in the record, United States v. Sanchez-Juarez, 446 F.3d 1109, 1116 (10th Cir. 2006), and:

> [t]he record before us reveals that the district court entertained Mr. Ruiz-
> Terrazas's Section 3553(a) arguments at length; indicated on the record that it had

> considered the Section 3553(a) factors; and proceeded to explain its reliance on
> the range suggested by the sentencing Guidelines. In our view, no more is required
> by statute or our precedents.

United States v. Ruiz-Terrazas, 477 F.3d at 1202-03. Here, the Court dedicated several pages in

its opinion to a thorough consideration of the § 3553(a) factors in determining "whether -- and if

so, by how much -- to reduce Lewis' sentence below 188 months -- at the low end of the current

advisory Guidelines range." See United States v. Lewis, 2019 WL 219508, at *28-31. Although

Lewis objects to the number of words the Court dedicated to some factors relative to others, the

Court carefully considered all of the materials which it received, including but not limited to the

Letters in Support, and the Court explained the rationale for its decision to impose on Lewis a

sentence at the low end of the advisory Guidelines range. Lewis cites to no authority requiring the

Court to have done more.

Although Lewis suggests that Pepper v. United States implies that the "denial of the

opportunity to present [post-sentencing rehabilitation evidence] was error," Motion at 2-3, Pepper

v. United States permits, but does not require, a district court to consider post-sentencing

rehabilitation evidence in any particular form. See 562 U.S. at 1233 (noting that a district court

has wide discretion in the sources and evidence it may use to assist it in determining the extent of

punishment). In its MOO, the Court cites to evidence of post-sentencing rehabilitation that Lewis

presents to the Court. See, e.g., United States v. Lewis, 2019 WL 2192508, at *11 (citing to the

statements in the Defendant's Emergency Motion to Reduce Sentence Pursuant to the First Step

Act of 2018 Immediate Release Eligible at 6, filed February 11, 2019 (Doc. 153)("First Step Act

Motion"), that Lewis completed his GED in custody, took dozens of self-improvement practices,

and had a remote and minor disciplinary history in custody); id. at *29 (citing that, while

incarcerated, Lewis had no significant disciplinary actions and none since 2015 and referencing

the specifics of Lewis' post-incarceration violations which the Reentry Plan Progress Report from the BOP describes); 2019 WL 2192508, at *29 (stating that "Lewis has completed several courses and certifications while incarcerated, including completing his GED, an Inmate Financial Responsibility Program, parenting classes, food service and cooking classes, vocational courses, and drug education courses."); 2019 WL 2192508, *29 (indicating that "Lewis has remained in contact with his children while in custody."). Lewis presented evidence of post-sentencing rehabilitation to the Court, and the Court considered that evidence in determining Lewis' sentence after the First Step Act.

Lewis also argues that a First Step Act proceeding is most analogous to a sentencing proceeding that rule 42(a)(3) governs, rather than to a sentencing correction that rule 43(b)(4) governs, and that, accordingly, a defendant's presence at a First Step Act hearing is required. In support of his argument, Lewis references the First Step Act's use of the verb "impose." Motion at 3 (citing First Step Act § 404). Lewis argues that the "limited exception to the defendant's required [presence] at sentencing does *not* apply to statutes described by 18 U.S.C. § 3582(c)(1)(B)," but rather applies "only to proceedings that are authorized by Section 3582(c) itself" as a result of retroactive Guidelines changes, or a BOP motion to reduce a sentence based on extraordinary and compelling reasons. Motion at 3-4 (emphasis in Motion). In United States v. Banuelos, No. 02-cr-084 WJ, 2019 WL 2191788 (D.N.M. May 21, 2019)(Johnson, C.J.), the Honorable William P. Johnson, Chief United States District Judge for the United States District Court for the District of New Mexico, summarized some of the caselaw regarding whether the First Step Act authorizes plenary resentencing with a full hearing:

> The majority of courts agree that the First Step Act does not authorize relief based on plenary resentencing issues. *See United States v. McKinney*, 2019 WL 2053998, at *2 (D. Kan. May 9, 2019)(collecting cases) . . . . *See*, *e.g.*, *U.S. v. Glover*, 2019 WL 1924706, at *7 (S.D. Fla. Apr. 11, 2019)(rejecting defendant's

> request for a "full resentencing hearing during which the Court must apply *Apprendi* [v. New Jersey, 530 U.S. 466]"); *United States v. Potts*, 2019 WL 1059837, at *2 (S.D. Fla. Mar. 6, 2019)(same); *U.S. v. Blocker*, 2019 WL 2051957 (N.D. Fla. Apr. 25, 2019)(same); *cf U.S. v. Lawson*, 2019 WL 1959490, at *3 (N.D. Ohio May 2, 2019)("Nothing in the First Step Act anticipates a full re-sentencing with application of laws . . . that have changed since a defendant's original sentencing, other than the retroactive application of . . . the Fair Sentencing Act.").

United States v. Banuelos, 2019 WL 2191788, at *2.  Although Lewis analogizes a First Step Act proceeding to a resentencing, rather than a sentence correction, the Court agrees that the majority of district courts have held differently, concluding that the First Step Act does not require a full resentencing with the defendant present.  The cases to which Lewis cites, which are not First Step Act cases, do not compel a different conclusion.  Lewis first cites to United States v. Brown, 879 F.3d 1231 (11th Cir. 2018), in which the United States Court of Appeals for the Eleventh Circuit stated:

> This Court has recognized that "[t]he established right to be present for sentencing -- or even for resentencing under certain circumstances -- . . . does not translate into a right to be present whenever judicial action modifying a sentence is taken."  [United States v.]Jackson, 923 F.2d [1494,] 1496 [(11th Cir. 1991)].  This is so because the act of changing a sentence "is not a unitary phenomenon."  United States v. Bryant, 643 F.3d 28, 33 (1st Cir. 2011).

United States v. Brown, 879 F.3d at 1237 (alterations added).  In United States v. Brown, the Eleventh Circuit noted as important the fact that, at Brown's first sentencing hearing, which lasted eight minutes, the court made almost no mention of either Brown's PSR or of the § 3553 factors.  See 879 F.3d at 1240.

> With such an abbreviated procedure, and the District Court's clear reliance on a mandatory minimum that no longer applies, the District Court has not "made the necessary credibility determinations and exercised the necessary discretion to fashion a sentencing package which he has determined, in fact, is the appropriate penalty."  Jackson, 923 F.2d at 1497.  Mr. Brown's presence is therefore required

> at a resentencing hearing to "contribute to the fairness of the procedure." [Kentucky v.]Stincer, 482 U.S. [730,] 745 [(1987)] . . . .

United States v. Brown, 879 F.3d at 1240.  The Eleventh Circuit also considered that the resentencing court imposed an upward variance without justification or advance notice.  See United States v. Brown, 879 F.3d at 1241.  The Eleventh Circuit did not suggest that a defendant's presence is required at a resentencing hearing where, as here, the original sentencing court considered the defendant's PSR and § 3553 factors, the resentencing court did not impose a variance without notice or justification, and the resentencing court did not perform a plenary resentencing.  See United States v. Brown, 879 F.3d at 1241.  Lewis also cites to United States v. Arrous, 320 F.3d 355 (2d Cir. 2003).  See Motion at 3-4.  In United States v. Arrous, the United States Court of Appeals for the Second Circuit held that a defendant must be present "where the district court re-enters a sentence which has been vacated or set aside by the Court of Appeals," and that "a defendant need not be present" where "the district court corrects or changes a pre-existing sentence."  320 F.3d at 359.  Here, an appellate court has not vacated or set aside Lewis' sentence, and the Court's task is to evaluate whether his existing sentence merits correction or change.  The Court's task, therefore, falls within the category of sentence modifications which the Second Circuit in United States v. Arrous determined to not require the defendant's presence.

Lewis next cites to United States v. Faulks, 201 F.3d 208 (3d Cir. 2000).  See Motion at 4.  In United States v. Faulks, the United States Court of Appeals for the Third Circuit addressed whether a defendant must be present at a resentencing conducted after an appellate court reverses a previously imposed sentence.  See 201 F.3d at 210.  The Third Circuit held that the appellate court, in reversing the sentence, was "directing a full resentencing."  201 F.3d at 210.  Here, an appellate court has not reversed Lewis' previous sentence, and Lewis is not entitled to a plenary resentencing, and the Court concludes that United States v. Faulks is inapposite, where it confines

its holding to situations where an appellate court "effectively vacat[es] the [original] sentence without directing a particular result." 201 F.3d at 211.

Last, Lewis cites to <u>United States v. Moree</u>, 928 F.2d 654 (5th Cir. 1991). <u>See</u> Motion at 4. The United States Court of Appeals for the Fifth Circuit also considered a situation where "the court of appeals has vacated the defendant's original sentence," and stated:

> We have long recognized the distinction between proceedings in the district court that modify an existing sentence and those that impose a new sentence after the original sentence has been set aside. In the former instance, the presence of the defendant usually is not required, unless the modification makes the sentence more onerous. In the latter instance, however, we have consistently held that a defendant's rights to be present and to allocute at sentencing, which are of constitutional dimension, extend to resentencing proceedings.

928 F.2d at 656. Like the other cases to which Lewis cites, <u>United States v. Moree</u> addresses a defendant's right to be present when a resentencing court is tasked with imposing a new sentence on a blank slate, after an appellate court vacates the previous sentence. <u>See</u> 928 F.2d at 656. The First Step Act's text indicates that it permits a court, under circumstances which the Act delineates, to reduce a previously imposed sentence, rather than to impose a sentence on a blank slate. <u>See</u> First Step Act § 404(c)(stating that "[n]o court shall entertain a motion made under this section *to reduce a sentence* if the sentence was previously imposed or previously reduced . . . . (emphasis added)). Lewis' cited cases, therefore, support the conclusion that First Step Act motion hearings are akin to sentence corrections which do not require the defendant's presence.

Lewis next contends that rule 43(b)(4)'s Advisory Committee Note suggests that rule 43(b)(4)

> applies only to proceedings that are authorized by Section 3582(c) itself, that is, to "resentencing hearings conducted under" § 3582(c) "as a result of retroactive changes to the Sentencing Guidelines by the United States Sentencing

Commission," and § 3582(c)(1)(A) "as a result of a motion by the Bureau of Prisons to reduce a sentence based on 'extraordinary and compelling reasons.'"

Motion at 4 (quoting Fed. R. Crim. P. 43, Advisory Committee Note (1998)).  The court in United States v. Downin, 884 F. Supp. 1474 (E.D. Cal. 1995)(Karlton, J.), explained, however:

> The Supreme Court teaches that advisory committee notes are "of weight" in the construction of the federal rules, but are not determinative.  Torres v. Oakland Scavenger Co., 487 U.S. 312, 316 . . . (1988).  Accordingly, they should be relied upon only when there is an ambiguity in the text of the rule which necessitates resort to extrinsic aids.  See Zaldivar v. City of Los Angeles, 780 F.2d 823, 831 n.9 (9th Cir. 1986)(advisory committee notes guide interpretation of ambiguous rules); see also Tello v. McMahon, 677 F. Supp. 1436, 1441 (E.D. Cal. 1988)[(Karlton, C.J.)](principles of statutory construction generally).  Although it has been said that the advisory committee notes more accurately reflect actual congressional intent and thus are entitled to greater weight than other forms of legislative history, see United States v. Anderson, 942 F.2d 606, 611 (9th Cir. 1991), they remain extrinsic sources.  When the language of a rule is unambiguous, it is conclusive, and resort to such extrinsic sources is unnecessary since construction is unnecessary.  See Tello, 677 F. Supp. at 1441.

United States v. Downin, 884 F. Supp. at 1479.  Rule 43(b)(4)'s plain language refers to 18 U.S.C. § 3582(c) in its entirety, and not just to 18 U.S.C. § 3582(c)(2) and to 18 U.S.C. § 3582(c)(1)(A).  See Fed. R. Crim. P. 43(b)(4).  The Court concludes, therefore, that under rule 43(b)(4)'s plain language, Lewis' appearance is not required for the Court to reduce his sentence under § 3582(c)(1)(B).

At the hearing on the Motion, Lewis began by discussing United States v. Potts, to which the Court cites in its MOO.  See Tr. at 2:9-11 (Converse).  Lewis argued that Judge Rosenberg, who decided United States v. Potts, commented during a later hearing on the case that, although she understood some judges "with the agreement of both parties" resentence under the First Step Act without the defendant present, she "really wanted to see who [the defendant was], who [the defendant is], and understand what [the defendant might] need if the court were to resentence [the defendant] . . . ."  Tr. at 2:14-21 (Converse).  Lewis argued that Judge Rosenberg "express[ed] her

pleasure that Mr. Pot[t]s was there," and Lewis averred that "that's because in many cases, and we submit this is one of them, who the person is today is not who they were before." Tr. at 3:1-6 (Converse). The Court reviewed Judge Rosenberg's Resentencing Proceedings Transcript (dated April 26, 2019), which Lewis provided via email on June 7, 2019. Potts was originally given a life sentence, and because mandatory life was required, at the original sentencing, "there wasn't a lot of information presented about Mr. Potts and who he is and how he got to this point." Resentencing Proceedings Transcript at 9:7-10 (Becker). Judge Rosenberg noted that "it cannot have a plenary resentencing insofar as reconsideration of issues like drug quantity and Career Offender determination that the Court made at the time of the sentencing, and this Court is not doing that." Resentencing Proceedings Tr. at 40:9-12 (Rosenberg). Nothing in the Resentencing Proceedings Transcript indicates that Judge Rosenberg viewed Potts' presence at the resentencing mandatory. Potts, like the defendant in <u>United States v. Brown</u>, 879 F.3d at 1240, and unlike Lewis, experienced a perfunctory original sentencing proceeding at which his § 3553 factors were not fully considered, because of a mandatory life sentence requirement. <u>See</u> Resentencing Proceeding Tr. at 9:7-10 (Becker). The rationale for granting Potts an opportunity to allocute at his resentencing, therefore, does not apply to Lewis, whose original sentencing court considered his PSR and § 3553(a) factors and provided him with an opportunity to allocute.

Lewis also contended that, in the Order in <u>United States v. Rhines</u>, 4:01-cr-00310-JEJ (M.D. Pa. May 13, 2019)(Jones, J.)("<u>Rhines</u>"), the court held that a defendant was "entitled to a full resentencing hearing and anything less would be a miscarriage of justice." Tr. at 3:6-10 (Converse). <u>See</u> <u>Rhines</u> at 3. Rhines "was sentenced [pre-<u>Booker</u>] under [the] mandatory guideline[s] scheme." Tr. at 3:11-13 (Converse). Lewis averred that the Honorable John E. Jones III, United States District Judge for the United States District Court for the Middle District of

Pennsylvania indicated that the only appropriate way to evaluate thoroughly Rhines' characteristics "through the prism of 3553(a) was to have him appear in open court and provide him with an opportunity to fully [allocute]." Tr. at 3:14-18 (Converse). Judge Jones noted, in <u>Rhines</u>, that at Rhines' original sentencing, "given the statutorily mandatory life sentence, there was absolutely no consideration of the sentencing guidelines or 18 U.S.C. § 3553(a) factors as they related to Rhines, nor any assessment made of his character or background." <u>Rhines</u> at 4. Judge Jones stated that "our decision is based upon the facts and circumstances of the case *sub judice*, thus we make no determination as to whether every potentially eligible defendant is wholesale entitled to a resentencing hearing under the First Step Act." <u>Rhines</u> at 5. The peculiarities present in Rhines' case are absent here, where Judge Hansen considered Lewis' PSR and § 3553(a) factors, and provided him with an opportunity to allocute. <u>Rhines</u>, therefore, does not alter the Court's analysis regarding Lewis' entitlement to a hearing.

Lewis also referenced <u>United States v. Leon</u>, No. 3:93CR199 (JCH) (D. Conn. May 20, 2019)(Hall, J.), in which Leon was present at the hearing and given the opportunity to allocute, and the only authority to which the Honorable Janet C. Hall, United States District Judge for the United States District Court for the District of Connecticut, cited to allow him to allocute was the First Step Act. <u>See</u> Tr. at 4:9-14 (Converse). Lewis provided a copy of the <u>United States v. Leon</u> order to the Court on June 7, 2019, and, having reviewed the order, the Court notes no mention of a hearing or of Leon's presence at a hearing anywhere in the order. <u>See</u> <u>United States v. Leon</u> at 1-4. At the hearing on the Motion, the Court stated that it still does not "see the defendant telling me anything in the statute that requires" a hearing and noted that the Court attempted to set up a telephonic hearing, but that Lewis "indicated he was kind of a rush," so the Court issued a written opinion. Tr. at 8:14-22 (Court). The Court stated that its inclination is "to think on these first step

hearings that a hearing is not required," and expressed its belief that "most courts have said that," but promised that the Court would "look at it and make sure that I haven't missed anything." Tr. at 9:17-23 (Court). Lewis has cited no authority indicating otherwise for defendants situated like himself. The Court has thoroughly reviewed all of the authority to which Lewis cited in his Motion and concludes that, as the Court concluded in its MOO, First Step Act motion proceedings do not require plenary resentencings, and do not require hearings with the defendant present.

Lewis also argues that he did not waive his right to a hearing. See Motion at 1. Lewis contends that the Court should have read his Notice of Non-Consent and request for a hearing as a notice of intent to present additional facts not already before the Court. See Motion at 1-2. Lewis emailed the Court on May 22, 2019. See Email from Kari Converse to Carol Bevel (dated May 22, 2019)(stating that "Mr. Lewis and his family, on the other hand, would like his hearing moved, so that they can appear personally before the judge."). The Court conducted a telephonic hearing for another First Step Act defendant, in United States v. Sanchez, 08-CR-1547 JB, on March 25, 2019. See Consent to Telephonic Hearing and Request for Telephonic Appearance, United States of America v. Sanchez, 08-CR-1547 JB, filed March 22, 2019 (Doc. 119). Although Lewis did not consent to a telephonic hearing, see Notice of Non-Consent at 1, Lewis is not entitled to an in-person hearing under the First Step Act, so his lack of waiver is not dispositive. The Court attempted to set up a telephonic hearing as it did in United States v. Sanchez, but Lewis "indicated he was kind of in a rush," so the Court issued a written opinion. See Tr. at 8:14-22 (Court). At

the Motion hearing, nevertheless, the Court set an in-person sentencing hearing for June 13, 2019.

See Tr. at 41:2-7 (Court).

## II.  18 U.S.C. § 3582(c)(1)(B), AND NOT 18 U.S.C. § 3582(c)(2), GOVERNS FIRST STEP ACT MOTIONS.

Lewis next argues that the Court erred in holding that First Step Act motions for sentence reduction are 18 U.S.C. § 3582(c)(2) proceedings.  See Motion at 4.  Lewis argues that the First Step Act is about statutory range modifications and not about Guideline amendments, and accordingly, First Step Act motions are not subject to § 3582(c)(2)'s restrictions, but rather should be construed as freestanding motions under the First Step Act's § 404.  See Motion at 5.  At the hearing, Lewis argued that the difference between construing the Motion as a § 3582(c)(2) proceeding or a § 404 proceeding is "what is considered at sentencing and what limitations exist," because Dillon v. United States imposes limitations on § 3582(c)(2) proceedings, but no such limitations exist for § 404 proceedings.  Tr. at 12:12-19 (Converse).  The Court asked what limitations exist under § 3582(c)(2) that do not exist under § 404, and Lewis averred that Dillon v. United States restricts the court's ability in a § 3582(c)(2) proceeding to vary below the advisory guidelines range.  See 12:23-13:5 (Court, Converse).  The United States argued that First Step Act motions should be considered as a synthesis of a § 3582 proceeding and a § 404 proceeding, but that in the end it is a § 3582 proceeding.  See Tr. at 22:10-16 (Spiers).  Lewis replied that United

preceded the First Step Act by many years, so it does not hold that First Step Act

motions are § 3582(c)(2) proceedings.  See Tr. at 22:20-23 (Converse).

The Court agrees that the proper vehicle to implement the First Step Act's § 404 is not

§ 3582(c)(2),[9] because, by its plain terms, § 3582(c)(2) allows a court to reduce a previously

imposed sentence where "a defendant . . . has been sentenced to a term of imprisonment based on

a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to

28 U.S.C. § 994(o) . . . ."   18 U.S.C. § 3582(c)(2).   The First Step Act's sentencing changes,

"wrought by the retroactive application of the Fair Sentencing Act are not the result of the

sentencing Commission's revision to the Sentencing Guidelines, but Congress's enactment of a

---

[9]The Court nevertheless notes that several courts have found § 3582(c) analogous and instructive in the First Step Act context.  See, e.g., United States v. Razz, 05-80011-CR-LENARD, 2019 WL 2204068, *8 (S.D. Fla. May 22, 2019)(Lenard, J.)(construing the First Step Act under § 3582(c)(1)(B) and relying on § 3582(c)(2) caselaw, because the court determined that the two provisions are "analogous"); United States v. Lawson, Case No. 1:03CR398, 2019 WL 1959490 (N.D. Ohio May 2, 2019)(Lioi, J.)(relying on § 3582(c)(2) caselaw in the First Step Act context and stating that "a reduction of sentence pursuant to the First Step Act is analogous to a reduction of sentence under 18 U.S.C. § 3582(c)(2), based on a retroactive guideline amendment, which does not require plenary resentencing"); United States v. Russo, 8:03CR413, 2019 WL 1277507, *2 (D. Neb. March 20, 2019)(Camp, J.)(stating that the court "finds persuasive the Government's argument that a reduction of sentence pursuant to the First Step Act is analogous to a reduction of sentence under 18 U.S.C. § 3582(c)(2), based on a retroactive Guideline amendment, which does not require plenary resentencing").  In United States v. Sampson, 360 F. Supp. 3d 168 (W.D.N.Y. 2019)(Larimer, J.), the Honorable David G. Larimer, United States District Judge for the United States District Court for the Western District of New York, noted that district courts are split whether the appropriate procedural vehicle for First Step Act Motions is § 3582(c)(2) or § 3582(c)(1)(B), but that the "crux of the dispute" is not "about choosing between [the two].  The chief dispute [is] about the scope of proceedings permitted under the First Step Act: whether a full resentencing [is] required, or whether a simple modification of sentence would suffice."  360 F. Supp. 3d at 171.  Judge Larimer relied on cases decided under § 3582(c)(2) and determined that the First Step Act does not require a full resentencing, but instead that it "'contemplates a recalculation of a defendant's Guidelines numbers under the Fair Sentencing Act and a possible sentencing reduction consistent therewith, if warranted.'"  United States v. Sampson, 360 F. Supp. 3d at 171 (quoting United States v. Davis, 07-CR-245S(1), 2019 WL 1054554, at *2 (W.D.N.Y. March 6, 2019)(Skretny, J.)).

new statute." United States v. Shelton, Cr. No. 3:07-329 (CMC), 2019 WL 1598921, at *2 (D.S.C. April 15, 2019)(Currie, J.).  The Court agrees with the majority of district courts to consider the issue, that 18 U.S.C. § 3582(c)(1)(B) "is the appropriate vehicle for sentence reductions sought under the First Step Act."  United States v. McKinney, Case No. 06-20078-01-JWL, 2019 WL 2053998, *2 (D. Kan. May 9, 2019)(Lungstrum, J.).  Section 3582(c)(1)(B) permits modification of an imposed imprisonment term to the extent "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B).  Although Lewis suggests that § 404 functions as a freestanding remedy divorced from the caselaw addressing § 3582(c)(1)(B), Lewis acknowledges that other courts construe First Step Act motions as § 3582(c)(1)(B) motions.  See Tr. at 22:24-23:7 (Lewis).  Lewis noted that the Court quoted § 3582(c)(1)(B) in its opinion.  See Tr. at 23:7-9 (Lewis).  The Court concludes that the First Step Act should be read together with 18 U.S.C. § 3582, which overarchingly governs the finality of criminal sentences, and the Court agrees with the reasoning that United States v. Shelton states:

> Section 404 must be read together with other existing statutes -- including § 3582(c).  See, e.g., United States v. Fausto, 484 U.S. 439, 452-53 (1988)(courts must carry out the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination.").  Significantly, § 3582 provides an overarching provision that governs the finality of criminal sentences.  See, e.g., United States v. Goodwyn, 596 F.3d 233, 245 (4th Cir. 2010)("[T]he law closely guards the finality of criminal sentences," and "Section 3582, which governs the imposition of federal prison sentences, embraces this principle.").

> Section 3582(c)(1)(B) provides a straightforward way to implement the retroactive changes in the First Step Act because it permits a modification of a sentence when "expressly permitted by statute," as the First Step Act does here.  Other district courts analyzing First Step Act motions for relief agree.  See, e.g., United States v. Davis, No. 07-cr-245S, 2019 WL 1054554, at *2 (W.D.N.Y. Mar. 6, 2019); United States v. Potts, No. 2:98-cr-14010, 2019 WL 1059837, at *2-3 (S.D. Fl. Mar. 6, 2019); United States v. Delaney, No. 6:08-cr-00012, 2019 WL 861418, at *1 (W.D. Va. Feb. 22, 2019): United States v. Fountain, No. 1:09-cv-00013, 2019 WL 637715, at *2 (W.D.N.C. Feb. 14, 2019): United States v. Jackson, No. 5:03-cr-30093, 2019 WL 613500, at *1 (W.D. Va. Feb. 13, 2019); United States v. Copple, No. 17-cr-40011, 2019 WL 486440, at *2 (S.D. Ill. Feb. 7, 2019); United States v.

*Drayton*, Crim. No. 10-20018, 2019 WL 464872, at *2 (D. Kan. Feb. 6, 2019); *United States v. Kambler*, No. 09-cv-40050, 2019 WL 399935, at *2 (S.D. Ill. Jan. 31, 2019).

Section 3582(c)(1)(B) also fits the structure of § 404 of the First Step Act. Section 404(b) of the First Step Act and § 3582(c) both provide that multiple actors -- including a district court, the Director of the Bureau of Prisons, the Government, and defendants -- may initiate requests for sentence reductions. Statutory provisions in § 3582(c) cover: motions filed by the Government (such as motions under Fed. R. Crim. P. 35 addressed in § 3582(c)(1)(B); motions filed by the Director of the Bureau of Prisons (such as motions addressed in § 3582(c)(1)(A) and (c)(2); motions filed by defendants (such as motions addressed in § 3582(c)(1)(A) and (c)(2)); and proceedings initiated by the sentencing court (such as motions addressed in § 3582(c)(2)).

. . . .

In short, § 3582(c)(1)(B) is the appropriate mechanism for granting relief under § 404 of the First Step Act.

2019 WL 1598921, at *2. Even courts that have construed the First Step Act's § 404 as a freestanding provision authorizing sentence reduction have noted 18 U.S.C. § 3582(c)(1)(B) as "complementary authority." United States v. Dodd, 372 F. Supp. 3d 795, 797 n.2 (S.D. Iowa 2019)(Pratt, J.). 18 U.S.C. § 3582(c)(1)(B) "does not delineate the scope of what the district court should consider when resentencing is authorized by another provision," nor does it place "any substantive limit on the district court's ability to grant a modification." United States v. Rose, 03-CR-1501 (VEC), 2019 WL 2314479, *6 (S.D.N.Y. May 24, 2019)(Caproni, J.). The Court concludes that nothing in 18 U.S.C. § 3582(c)(1)(B) precludes it from "considering anew the sentencing factors enumerated in § 3553(a)." United States v. Rose, 2019 WL 2314479, at *6. At the hearing, the Court asked what difference it makes if the motion is construed as a § 3582(c)(2) proceeding or a § 404 proceeding. See Tr. at 12:9-11 (Court). Lewis argued that the difference is "what is considered at sentencing and what limitations exist," because Dillon v. United States imposes limitations on § 3582(c)(2) proceedings, but no such limitations exist for § 404

proceedings.  See Tr. at 12:12-19 (Converse).  The Court asked what limitations exist under § 3582(c)(2) that do not exist under § 404, and Lewis averred that Dillon v. United States restricts the court's ability in a § 3582(c)(2) proceeding to vary below the advisory Guidelines range.  See 12:23-13:5 (Court, Converse).  The Court reiterates its statement in the MOO:

> The Court concludes that, although the First Step Act does not require a full resentencing with the defendant present, the First Step Act permits a court to consider the 18 U.S.C. § 3553(a) factors in determining whether a First Step Act-eligible defendant's circumstances warrant a sentence reduction, and to what extent the court should reduce his or her sentence.

MOO at 56, 2019 WL 2192508, at *20.

The Court, in its MOO, does not limit its consideration of the sentencing factors in any way, and, after considering the § 3553(a) factors, concludes that the "punishment set forth in the working Guidelines range is appropriate for Lewis' offense."  MOO at 85, 2019 WL 2192508, at *31.  The Court concludes that it, like Judge Hansen and the USPO, "did not see a basis for a variance."  MOO at 82, 2019 WL 2192508, at *30.  The Court does not act outside of its usual practice: "Normally, in this case, where the upward factors -- both quantitatively and qualitatively -- outweigh the downward factors, the Court would keep the sentence in the Guidelines range and sentence at the bottom of the Guidelines range."  MOO at 85, 2019 WL 2192508, at *31.  That Lewis "benefitted from a lower-than-proper Guidelines calculation" at his original sentencing influences the Court in part because, as was the practice at the time, Judge Hansen "adopted the parties' fact-bargaining stipulation . . . ."  MOO at 83, 2019 WL 2192508, at *30.  The Court's decision to assign Lewis a sentence within the advisory Guidelines range came about after a thorough consideration of the § 3553(a) factors placing upward and downward pressure on his sentence, and, as the Court's MOO illustrates, the Court does not allow any limitations under § 3582(c) to influence its sentencing decision.  Accordingly, although the Court

agrees that a First Step Act motion is not a § 3582(c)(2) proceeding, but rather a § 3582(c)(1)(B) proceeding -- and even if the Court were to conclude that the First Step act is an entirely freestanding remedy -- the result in Lewis' case is the same, because the Court did not impose any limitations on its consideration of the sentencing factors.

## III.    THE COURT DID NOT RELY ON THE LACK OF A GUIDELINES AMENDMENT REGARDING THE FIRST STEP ACT IN DETERMINING LEWIS' ELIGIBILITY FOR RELIEF.

Lewis argues that, "[t]o the extent that this Court relies on the lack of a USSC guideline amendment regarding the First Step Act, this is not a relevant consideration." Motion at 5. In footnote 14 of the Court's MOO, the Court states:

> The United States Sentencing Commission has yet to promulgate a Guidelines amendment to officially effectuate the First Step Act. The First Step Act makes the Fair Sentencing Act applicable to covered offenses committed before the Fair Sentencing Act's enactment. The President signed the First Step Act into law after the United States Sentencing Commission released the latest version of the Guidelines Manual. See First Step Act (signed into law on December 21, 2018); United States Sentencing Commission, 2018 Guidelines Manual, https://www.ussc.gov/guidelines (last visited April 8, 2019)(stating that the 2018 Guidelines Manual became effective on November 1, 2018).

MOO at 55 n.14, 2019 WL 2192508, at *19 n.14. Lewis does not advance any argument that the Court relies on the lack of a Guidelines amendment, and the Court did not rely on that fact in determining Lewis' eligibility for relief. See Motion at 6-7. The Court includes the footnote in its discussion of the Fair Sentencing Act and the background to the First Step Act's enactment, and not in its analysis. See MOO at 55 n.14, 2019 WL 2192508, at *19 n.14. Lewis can point to

nothing in the Court's MOO suggesting that the Court relied on the lack of a Guidelines amendment in any way.

## IV. THE COURT DOES NOT RESTRICT IMPROPERLY ITS ABILITY TO IMPOSE A SENTENCE BELOW THE APPLICABLE GUIDELINES RANGE AND CONDUCTED A THOROUGH REVIEW OF THE 18 U.S.C. § 3553(a) FACTORS.

Lewis argues that "*Dillon* is inapplicable here, and there is no limitation on a Court's ability, at sentencing, to impose a sentence below the applicable guideline range." Motion at 6. The Court, having concluded in this Memorandum Opinion and Order that a First Step Act motion is not a § 3582(c)(2) proceeding, agrees that a resentencing court may impose a sentence below the advisory Guidelines range.[10] The Court disagrees with Lewis' statement that there is no

---

[10]The Court concludes, however, that all of the cases to which Lewis cites on the Motion's pages 6 and 7 are distinguishable from the present case. See United States v. Shelton, Cr. No. 3:07-329 (CMC), 2019 WL 1598921, at *3 (D.S.C. April 15, 2019)(Currie, J.)(stating that the defendant "is subject to a mandatory statutory range of between ten years and life imprisonment and a supervised release term of at least eight years. His advisory guideline range is 262-327 months," and not imposing a sentence in the opinion); United States v. Moreno, No. 07-00101 (E.D. Wis. April 12, 2019), ECF No. 43 (Adelman, J.)(assigning a below-Guidelines First Step Act sentence where the original sentencing judge assigned the defendant a below-Guidelines sentence); United States v. Erskine, No. 05-CR-1234 (S.D.N.Y. March 5, 2019)(Chin, J.)(reducing defendant to time served, below career offender guideline range, where, under current law, defendant would no longer qualify as a career offender); United States v. Newton, Case No. 5:02-CR-30020, 2019 WL 1007100, *5 (W.D. Va. March 1, 2019)(Urbanski, C.J.)(sentencing the defendant to a sentence below the career offender guideline range because, if the defendant were sentenced today, he would not be designated a career offender based on changes in the law); United States v. Monroe, No. 94-cr-00014 (W.D. Va. Feb. 19, 2019), ECF No. 356 (Moon, J.)(stating that the court would vary below the Guidelines, because the original sentencing judge stated that he would sentence the defendant below the Guidelines if the mandatory minimums did not constrain the court, which do not exist under current law); United States v. Balcom, No. 4:02-cr-00052, ECF No. 169 at 4-5 (N.D. Fl. Jan. 28, 2019)(Hinkle, J.)(sentencing the defendant to a sentence below the career offender guideline range because, if the defendant were sentenced today, he would not be designated a career offender based on changes in the law). Neither party contests that Lewis is a career offender, even under current law, so the considerations of the courts in the cases to which Lewis cites do not apply here, because Lewis remains a career offender under current law, the original sentencing court did not assign a below-Guidelines sentence, and the original sentencing court did not decline to vary because of a constraint that the law has since removed. Nor is the Court's decision to assign Lewis a bottom-of-the-Guidelines sentence an indication that the Court believes the Guidelines to be mandatory -- to the contrary, the Court dedicates considerable time

limitation on a Court's ability to do so, because the Court concludes it may not impose a sentence less than the time of imprisonment the defendant has already served. <u>See</u> U.S.S.G. § 1B1.10(b)(2)(C) cmt. n.3 ("In no case, however, shall the term of imprisonment be reduced below time served."). <u>See also</u> <u>United States v. Sampson</u>, 2019 WL 1141528, at *2 (stating that the appropriate remedy when a defendant is entitled to a sentence reduction that is greater than his time served, is to reduce his sentence to the time served); <u>United States v. Laguerre</u>, No. 02-cr-30098, 2019 WL 861417, at *3-4 (W.D. Va. Feb. 22, 2019)(Dillon, J.)(advancing several reasons for not reducing a defendant's sentence below time served, including the need to protect the public, the need for deterrence, and the court's unwillingness to allow a defendant to

---

and space in its MOO to considering all of the factors putting pressure on Lewis' sentence, before concluding that a sentence within the advisory Guidelines range appropriately reflects the sentencing goals.

Similarly, the cases Lewis cites in his Supplement are also distinguishable. In each of those cases, the courts looked primarily at the defendants' post-conviction conduct, along with a passing nod to the § 3553(a) factors, to arrive at sentence reductions. <u>See</u>, <u>e.g.</u>, <u>United States v. Ballinger</u>, No. 2:09-CR-105, 2019 WL 3292156 (E.D. Tenn. July 22, 2019)(Greer, J.)(deciding, without analysis or citation to § 3553(a), to reduce the defendant's sentence to time served). The courts in these cases take the view that the First Step Act liberates courts' discretion from the Guidelines, such that "the only limits found in the First Step Act are the statutory minimums of the Fair Sentencing Act's new thresholds." <u>United States v. Boulding</u>, 379 F. Supp. 3d 646, 653 (W.D. Mich. 2019). The Court believes that its decision under the First Step Act should be grounded in the § 3553(a) factors -- which the Court has extensively considered. <u>See</u> <u>United States v. Lewis</u>, 398 F. Supp. 3d at 977.

Although the First Step Act places no limitations on what a court may consider in resentencing a First Step Act-eligible defendant, the Court should ensure that the sentence imposed meets the goals of sentencing that 18 U.S.C. § 3553(a) outlines, namely, the need for the sentence to: (i) reflect the seriousness of the offense; (ii) promote respect for the law; (iii) provide just punishment; (iv) afford adequate deterrence, both specific and general; (v) protect the public from the defendant's further crimes; and (vi) avoid unwarranted sentencing disparities between similar defendants found guilty of similar crimes. <u>See</u> 18 U.S.C. § 3553(a). The Court's decision to not reduce Lewis' sentence under the First Step Act reflected careful consideration of the § 3553(a) factors. <u>See</u> <u>United States v. Lewis</u>, 398 F. Supp. 3d at 986-90 (observing fourteen factors that put upward pressure on Lewis' sentence, compared with twelve that place downward pressure on Lewis' sentence).

bank time with respect to future offenses); <u>United States v. Tucker</u>, 356 F. Supp. 3d at 808 (reducing sentence to time served); <u>Miller v. Cox</u>, 443 F.2d 1019, 1021 (4th Cir. 1971)("[T]he availability of credits against sentences for future crimes would provide a sense of immunity and an incentive to engage in criminal conduct."). As discussed <u>supra</u> § II, the Court did not limit its consideration of sentencing factors in the MOO and declines to impose a variance after thoroughly considering the upward and downward factors putting pressure on Lewis' sentence. <u>See</u> <u>supra</u> § II.

## V.     THE COURT CONCLUDES THAT THE 2018 GUIDELINES MANUAL APPLIES, BUT THAT THE GUIDELINES CALCULATIONS REMAIN UNCHANGED.

Lewis argues that the Court erred in concluding that the 2009 Guideline manual, rather than the 2018 manual, applies to its sentencing decision. <u>See</u> Motion at 8. Lewis argues that the "general rule is that a defendant should be sentenced under the law in effect at the time of sentencing." Motion at 8. Lewis contends that § 3553(a)(4) "states that the guidelines 'in effect on the date the defendant is sentenced' apply, except as provided in § 3742(g)(1).'" Motion at 8 (quoting 18 U.S.C. § 3553(a)(4)(A)(ii)). Lewis contends that the only exception to § 3553(a)(4)(A) other than § 3742(g)(1) is the ex post facto clause and that, absent an "ex post facto violation, a court must apply the current guidelines at resentencing, must apply other law as it stands at the time of resentencing, and must resentence a defendant in light of factual circumstances as they stand at resentencing." Motion at 8. The United States and Lewis agreed that the Guidelines do not change under either manual. <u>See</u> Tr. at 25:5-11 (Spiers); <u>id.</u> at 25:15-16 (Converse). The United States noted that, in calculating Lewis' eligibility, the USPO referred to the 2018 Guidelines and arrived at the same result as the Court. <u>See</u> Tr. at 26:2-4 (Spiers).

The Court agrees that the 2018 Guidelines apply, absent an ex post facto violation. <u>See</u> <u>United States v. Tidwell</u>, 827 F.3d 761, 764 (8th Cir. 2016). Using Lewis' new offense statutory

maximum of 30 years,[11] section 4B1.1 in both the 2009 Guidelines and the 2018 Guidelines

provides that the corresponding offense level is 34, minus 3 for acceptance of responsibility to 31.

See U.S.S.G. § 4B1.1.  The Court's calculation of Lewis' advisory Guidelines range, therefore,

remains unchanged.  Lewis' applicable Guidelines range after the First Step Act is 188 to 235

months.  See MOO at 76, 2019 WL 2192508, at *28.  See also U.S.S.G. Sentencing Table (noting

the range corresponding to a base offense level of 31 and a criminal history category of VI).

## VI.    THE COURT WILL NOT CONSIDER LEWIS' RACE IN DETERMINING HIS SENTENCE.

Lewis argued at the June 5, 2019, hearing, for the first time, that his race largely

predetermines his criminal history category.  See Tr. 16:12-25 (Converse).  Specifically, Lewis

argued that

> there's a high probability that his criminal history that Your Honor relied so heavily
> upon exists because of his race.  The lifetime likelihood of imprisonment for all

---

[11]The Court calculated in its MOO:

> Reconsidering Lewis' term of imprisonment, pursuant to the First Step Act,
> the Court concludes that Lewis' advisory Guidelines range is now 188 to 235
> months -- the range the original sentencing court used.  Pursuant to the First Step
> Act, the amount of cocaine base attributed to Lewis, see Plea Agreement ¶ 7(b), at
> 3 (attributing to Lewis 23.2 grams of cocaine base), amends his penalties to reflect
> those of 21 U.S.C. § 841(b)(1)(C), which carries a maximum term of imprisonment
> of 20 years, see First Step Act § 404; Fair Sentencing Act § 2(a)(2) (now requiring
> at least 28 grams of cocaine base to warrant an imprisonment term between five
> and forty years), see also 21 U.S.C. § 841(b)(1)(C)(providing a statutory penalty
> maximum of 20 years for less than 28 grams of cocaine base); USPO Memo. at 1.
> The USPO contends that "the 21 U.S.C. § 851 penalty enhancement remains
> applicable," so Lewis' "statutory penalties become not more than 30 years."  USPO
> Memo. at 1.  See 21 U.S.C. § 841(b)(1)(C); 21 U.S.C. § 851.

MOO at 75-76, 2019 WL 2192508, at *28.

men is one in nine. For white men it's one in seventeen. For black men, it's one in three. And . . . one can conclude that there's disparity in sentencing.

Tr. at 16:18-17:21 (Converse). Lewis did not specifically support these statistics, but offered to "provide data underlying it." Tr. at 18:17 (Converse). Lewis then pointed to a law review article which argues that prior record enhancements "exacerbate racial disparities in prison admissions and populations." Hester, Prior Record Enhancements at Sentencing: Unsettled Justifications and Unsettling Consequences, 77 Crime & Just. 209, 209 (2018). See Tr. at 17:25-18:7 (Converse). Lewis thus argues that his criminal history category is an epiphenomenon of other forces having little to do with Lewis' past choices, such as racial disparity in the United States, so it would be improper for the Court to rely on Lewis' criminal history category in upholding his sentence. See Tr. at 16:12-25 (Converse). Lewis does not specify whether he seeks a departure or a variance on these grounds, and does not point to any specific statutory or policy provision that could guide the Court's analysis. The United States declined to argue this point, noting that "there was no advance notice of that particular feature to this hearing." Tr. at 21:3-4 (Spiers).

Lewis developed this argument with more data in his Sentencing Memo. See Sentencing Memo. at 16. Lewis argues that "race has had an impact on every stage of the criminal proceedings. Blacks have been arrested, prosecuted, and sentenced at higher rates and more harshly than other ethnicities, particularly whites, beginning with disproportionate disciplinary referrals and actions in school." Sentencing Memo. at 16. Lewis argues that "racial disparity in incarceration is particularly stark with regard to drug crimes." Sentencing Memo. at 17 (citing United States v. Bannister, 786 F. Supp. 2d. Lewis does not argue or discuss how or whether these

disparities impacted his arrest and prosecution for the federal offense for which he seeks resentencing.

Lewis' argument echoes that of Michelle Alexander's 2010 book, The New Jim Crow: Mass Incarceration in the Age of Colorblindness (2010). Professor Alexander argues that the War on Drugs is the primary driver of increased incarceration rates, particularly among African American men. See generally The New Jim Crow. "The impact of the drug war has been astounding. In less than thirty years, the U.S. penal population exploded from around 300,000 to more than 2 million, with drug convictions accounting for the majority of the increase." The New Jim Crow at 6. Professor Alexander asserts that "the uncomfortable reality is that arrests and convictions for drug offenses -- not violent crime -- have propelled mass incarceration." The New Jim Crow at 102. Alexander further argues that "mass incarceration is, metaphorically, the New Jim Crow and . . . all those who care about social justice should fully commit themselves to dismantling this new racial caste system." The New Jim Crow at 11.

The Court has carefully reviewed the data on which Lewis relies, and notes that these statistics have been disputed. First, the Court observes the difficulty underlying statistical studies of the Federal Sentencing Guidelines' demographic impacts. See William Rhodes, et al., Bureau of Justice Statistics, Federal Sentencing Disparity 13 (2015)("Federal Sentencing Disparity"). Statistical approaches to testing the null hypothesis of sentencing equality vary widely, but can be roughly divided into two categories. See Federal Sentencing Disparity at 14. The first approach starts with the assumption that "the facts surrounding case as relevant to application of the Federal Sentencing Guidelines and to determine whether whites and blacks receive comparable studies." Federal Sentencing Disparity at 14 (compiling studies which use this approach). The other approach starts "with the facts surrounding the case at the time of prosecution, with the assertion

that prosecutors manipulate facts before they are considered for guideline application and determine whether offenders accused of the same crime receive the same treatment." Federal Sentencing Disparity at 14 (compiling studies which use this approach). See MOO at 67 n.20, 2019 WL 2192508, at *28 n.20 (describing the fact-bargaining process, and the Court's efforts to eliminate it in the Court's cases). "These two lines of inquiry answer different research questions[.]" Federal Sentencing Disparity at 14. A further challenge is the lack of data for the true crime rates in various demographics, and many studies either generalize across disparate regions and socioeconomic classes, see e.g., Benjamin Steiner & Victor Argothy, White Addiction: Racial Inequality, Racial Ideology, and the War on Drugs, 10 Temp. Pol. & Civ. Rts. L. Rev. 443 (2001)(examining class distinctions between whites and African Americans, but not within African American communities), or focus too narrowly on outlier sample pools, see, e.g., The New Jim Crow at 102 (generalizing nationally from a study of drug offenses in Chicago).

Accordingly, direct comparison of certain studies may be inapposite, depending on the methodologies used. For example, the United States Sentencing Commission reports that racial sentencing disparity increased since United States v. Booker, 543 U.S. 220. See U.S. Sentencing Comm'n, Demographic Differences in Sentencing Practices: An Update of the *Booker* Report's Multivariate Regression Analysis at 2 (2010). Using the same data, another study found little to no increase in post-Booker sentencing disparity and even found, for example, that "at the mean sentence length (62.6 months), Black female offenders receive sentences that are nearly 2 years (21.0) months less on average than their White male counterparts." Jeffrey T. Ulmer, et al., Racial

Disparity in the Wake of the Booker/Fanfan Decision: An Alternative Analysis to the USSC's 2010 Report, 10 Criminology & Pub. Pol'y 1077, 1091 (2011).

As for Lewis' statistics, contrary to what one would expect if structural racism were the prime driver of mass incarceration, incarceration rates have steadily risen since the 1980s in states where most inmates are white.  See Jennifer Bronson, Bureau of Justice Statistics, Special Report: Prisoners in 2017 at 13-14 tbl. 7 (2018)("Prisoners in 2017").  Second, and most contrary to Lewis' -- and Professor Alexander's -- theory, the "War on Drugs" has not been the main, or even a leading, cause of increased incarceration rates, be it in the population generally or among African Americans.  For the general population, the United States Bureau of Justice Statistics reports that, in state prisons, where almost eighty percent of all inmates in America are held, fifty-five percent serve sentences for violent offenses while only sixteen percent serve sentences for drug-related offenses.  See Prisoners in 2017 at 2-3.  Even if all drug offenders were released today, the United States would still have the world's largest prison population.[12]  Additionally, many critics of

---

[12]Exact numbers are exceedingly difficult to find, and numbers vary widely.  In 2017, however, the most recent year for which Bureau of Justice Statistics data is available, the estimated total number of prisoners -- individuals sentenced to more than one year -- in state and federal prisons was 1,489,400.  See Prisoners in 2017 at 3.  States held 1,306,300 prisoners in 2017, and federal prisoners totaled 183,100.  See Prisoners in 2017 at 3 tbl. 1.  Add to that 740,700 non-prisoner inmates confined in county and city jails.  See Zhen Zeng, Bureau of Justice Statistics: Jail Inmates in 2016 at 1 (2018).  Accordingly, there are approximately 2,230,100 people in jail or prison in the United States, excluding justice-related involuntary commitment to psychiatric hospitals, and those incarcerated in civil detention, territorial, and Indian Country prisons.  Of all state and local prisoners, about 190,100 -- less than fourteen percent -- were serving drug-related sentences.  See Prisoners in 2017 at 22 tbl. 13.  Federal prisons held approximately 86,610 prisoners serving drug related sentences.  See Prisoners in 2017 at 23 tbl. 14.  Accordingly, of all prisoners in the United States in 2017, about 276,210 were serving drug-related sentences. If each prisoner serving a drug-related sentence were freed immediately, there would still be approximately 1,953,890 people confined in jail or prison in the United States.  The country with the next largest total population of incarcerated persons is China, which holds approximately 1,649,804 prisoners.  World Prison Brief, "Highest to Lowest -- Prison Population Total," https://www.prisonstudies.org/highest-to-lowest/prison-population total?field_region_taxonomy_tid=All (last visited Oct. 25, 2019).

increased incarceration in the United States overlook the fact that America's prison boom was precipitated by a dramatic increase in crime rates: homicide rates doubled, and robbery rates tripled, between 1963 and 1974.  See Gary Lafree, Losing Legitimacy: Street Crime and the Decline of Social Institutions in America 20-22 (1998).

Nor are drug offenses the primary cause of the majority of African Americans' sentences. Of all African Americans incarcerated in state prisons, where most African American inmates are incarcerated, only thirteen percent were sentenced for drug-related crimes and sixty percent were sentenced for violent crimes.  See Prisoners in 2017 at 22 tbl. 13.  Of all African Americans incarcerated in federal prisons, forty-six percent are serving sentences for drug-related crimes, while twenty-six percent are serving sentences for non-violent, gun-related offenses and ten percent are serving sentences for violent crimes.  See Prisoners in 2017 at 24 tbl. 15.  This rate, however, largely reflects of the extent of federal jurisdiction, as violent crimes are primarily prosecuted in state courts, and also reflects the fact that federal prisons hold far fewer people overall than do state and local prisons and jails.  See Prisoners in 2017 at 38 tbl. 17.  Further, many inmates serving sentences for drug offenses were initially arrested for violent crimes, but pleaded guilty to lesser drug crimes.  See John Pfaff, Decarceration's Blindspots, 16 Ohio St. J. Crim. L. 253, 256 (2018).  It is also important to note that the federal prison population has declined steadily for the past five years.  See Prisoners in 2017 at 3.

Professor Alexander also asserts that the "vast majority of those arrested are *not* charged with serious offenses.  In 2005, for example, four out of five drug arrests were for possession, and only one out of five was for sales."  The New Jim Crow at 60.  Professor Alexander also avers that "most people in state prison for drug offenses have *no* history of violence or significant selling activity."  The New Jim Crow at 60.  Drug-related sentences in both state and federal prisons,

however, are overwhelmingly trafficking-related. See Prisoners in 2017 at 21 tbl. 12 (of all prisoners incarcerated in state prisons, 3.5% are serving sentences for drug possession, while 11.2% are serving sentences for "trafficking and other drug offenses."). Additionally, "[m]ore than 99% of federal drug offenders were sentenced for trafficking." Prisoners in 2017 at 23 tbl. 12, n.e.

Lewis is correct that imprisonment rates for African American males far exceeds that of any other racial group. See Sentencing Memo. at 18. African American males aged eighteen to nineteen are twelve times more likely to be imprisoned than white males of the same age. See Prisoners in 2017 at 15. It bears noting that imprisonment rates for African American adults have decreased more than those for white or Hispanic adults. See Prisoners in 2017 at 10 (noting that the rate of imprisonment for African American adults declined by thirty-one percent over the last ten years, compared with one percent for white adults and three percent for Hispanic adults). Further, the share of White people among the nation's drug offenders has risen over the last twenty years, while the share of African American drug offenders has declined over the same period. See Marc Mauer, The Sentencing Project, The Changing Racial Dynamics Of The War On Drugs at 5 (2009). From 2000 to 2009, the African-American imprisonment rate for drug offenses fell by sixteen percent, while the White imprisonment rate for drug offenses rose by more than twenty-five percent. See Eli Hager, "A Mass Incarceration Mystery," The Washington Post (Dec. 15, 2017) https://www.washingtonpost.com/news/wonk/wp/2017/12/15/a-mass-incarceration-mystery/ (last visited Oct. 26, 2019). Additionally, narratives of the criminal justice system like Lewis' obscure the effect of the nation's incarceration on other minorities. Hispanics comprise over twenty-three percent of all prisoners in the United States. See Prisoners in 2017 at 6 tbl. 3. Over half of all Hispanic federal prisoners serve sentences for drug trafficking conviction. See

Prisoners in 2017 at 16. This rate is a higher one than for African Americans in federal prison, of whom forty-seven percent serve drug trafficking sentences. See Prisoners in 2017 at 23 tbl. 14. At current rates, one in six Hispanic males born this decade will be imprisoned at some point in their lifetimes. See Marc Mauer & Ryan S. King, The Sentencing Project, Uneven Justice: State Rates Of Incarceration By Race And Ethnicity at 2 (July 2007). The number of Native American federal offenders increased by almost twenty-five percent between 2009 and 2013, and many districts see drastically disproportionate prosecution of Native Americans relative to population share. See U.S. Sentencing Comm'n, Native Americans in the Federal Offender Population at 1 (2015)(noting that, for example, the District of South Dakota's overall criminal docket is comprised of almost fifty-eight percent Native American offenders, although Native Americans make up only about nine percent of South Dakota's population). Finally, narratives like those of The New Jim Crow overlook the impact of income and education on incarceration rates. White men who drop out of high school are ten times more likely to be imprisoned at least once in their lives than white men who complete high school. See Bruce Western, Punishment And Inequality In America 26-28 (2006).

Data abounds, however, that African Americans are far more likely to be arrested and sentenced than are whites, see, e.g., U.S. Sentencing Comm'n, Report to Congress: Mandatory Minimum Penalties for Firearms Offenses in the Federal Criminal Justice System 22 (2018) at 6, despite making up thirteen percent of the United States population, see U.S. Census Bureau, American Community Survey, 2015 (available at https://www.census.gov/programs-surveys/acs/technical-documentation/race-ethnicity-aian.html, last visited October 25, 2019). See Prisoners in 2017 at 1, 6, 42-43. Even in the age group with the lowest Black-to-White racial disparity -- males aged sixty-five or older -- African American men are still four and a half times

more likely than White men of the same age group to be imprisoned.  See Prisoners in 2017 at 15. The overall disparity amounts to African American males being six times more likely to be imprisoned than white males.  See Prisoners in 2017 at 1.

Nonetheless, courts must consider each case based on each defendant, and not on the group or demographic to which that defendant belongs.  There is good reason for this principle.  "It ensures that criminal sanctions will be tied to individual culpability and characteristics, rather than to group membership."  United States v. Rose, 885 F. Supp. 62, 66 (E.D.N.Y. 1995)(Weinstein, J.). Accordingly, the Guidelines expressly prohibit the Court "from considering race, national origin, creed, and religion."   United States v. Palma, 376 F. Supp. 2d 1203, 1217 (D.N.M. 2005)(Browning, J.)(citing U.S.S.G. § 5H1.10).   Indeed, the Due Process Clause of the Fifth Amendment to the Constitution of the United States of America, through which the Fourteenth Amendment to the Constitution of the United States' equal protection guarantee applies to the federal government, see Bolling v. Sharpe, 347 U.S. 497, 498-500 (1954)(Warren, C.J.), precludes the Court from considering Lewis' race in determining his sentence.  See e.g., Zant v. Stephens, 462 U.S. 862, 885 (1983)(Stevens, J.)(holding that race is "totally irrelevant to the sentencing process"); United States v. Webster, 162 F.3d 308, 355 (5th Cir. 1998)(holding that "race cannot be considered as either a mitigating or aggravating factor" in sentencing).  Instead, courts must consider each defendant before them as an individual, and not as a metonym for or mere representative of his or her race.  The Guidelines direct courts to avoid "sentencing disparities, not sentencing impact disparities," and "it is intuitive that the former objective is amenable to court action while the latter involves factors that are beyond the control of the sentencing judge."  United States v. Sanchez-Estrada, 62 F.3d 981, 990 (7th Cir. 1995).  "It is essentially a public policy question, as opposed to a legal question, whether the harsh penalties associated with 'crack

trafficking' should be relaxed for African Americans because they are 'disproportionately' prosecuted for such activity."  United States v. McMurray, 833 F. Supp. 1454, 1467 (D. Neb. 1993)(Kopf, J.) rev'd and remanded on other grounds sub nom United States v. Hasan, 245 F.3d 682 (8th Cir. 2001).  Our judicial system does not incarcerate anyone by race or by class; it does not incarcerate thousands of defendants at any one time.  It incarcerates individuals, one at a time.  To focus too much on results rather than the process is unfair to a system that focuses on procedural fairness, and does not try to reach a preordained result or goal.  If the procedure is fair, the Court is less concerned whether there is an acquittal or a conviction.

Race, of course, has myriad, pernicious influences on our society, causing disparate levels of privilege and disadvantage, opportunity and struggle.  Lewis' argument, however, focuses on African Americans as a class to argue that criminal history categories may overstate African Americans' propensity to commit crime.  See Tr. at 16:12-25.  In no way does he tie this broad argument to his personal characteristics or experiences to argue that his criminal history category is misleading because he is African American.  Cf United States v. Rose, 885 F. Supp. at 66 ("While race itself cannot be considered so as to denigrate an individual or a class, 'facts about a defendant's life may be highly relevant in sentencing while also correlating to the defendant's gender, race, national origin, beliefs or economic situation" (quoting United States v. Gaviria, 804 F. Supp. 476, 480 (E.D.N.Y. 1992)(Weinstein, J.)).  Lewis does not make such an argument, and

the Court will not consider race generally as a factor in setting Lewis' sentence. See U.S.S.G. § 5H1.10.

Lewis' objective for this argument is also unavailing. As a factual basis for his initial plea, Lewis provided the following information:

> At the time of the incident, I was a career offender pursuant to United States Sentencing Guidelines (U.S.S.G.) § 4b1.1(b). Specifically, I had the following prior felony convictions:
>
> I.   Aggravated Assault With A Deadly Weapon, a 4th Degree Felony, in the Second Judicial District Court, Case No. D-202-CR-9902789; and
> II.  False Imprisonment, a 4th Degree Felony, and Robbery, a 3rd Degree Felony, in the Second Judicial District Court, Case No. D-202-CR-9902789.
>
> . . . At the time of this incident, I also had a prior felony drug conviction of Possession of a Controlled Substance, a 4th Degree Felony, in the Second Judicial District Court, Case No. D-202-CR-9602246.

Plea Agreement ¶¶ 7-9, at 3-5. Lewis remains a career offender under current law, a fact which Lewis acknowledges. See supra n.7. See also First Step Act Motion at 5. Lewis requests, however, that the Court consider his race in his criminal history category's context. See Tr. at 16:12-25. Accordingly, even if the Court considered Lewis' race and racial disparities in this country generally, Lewis would remain career offender under current law.

The relevant Guidelines policy statement provides that a court may grant a downward departure "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3 cmt. n.3. A departure is generally warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Koon v. United States, 518 U.S. 81, 92 (1996). Accord United States v. Lewellen, No. 11-1524, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.). Courts of Appeals

have uniformly held that disparate impact arguments do not justify downward departure.  See, e.g., United States v. Arrington, 73 F.3d 144, 146 (7th Cir. 1996); United States v. Alton, 60 F.3d 1065, 1071 (3d Cir. 1995).  Instead, departures are proper in cases with unusual circumstances  which "render unjust an otherwise just sentence under the guidelines."  United States v. Thompson, 27 F.3d 671, 679 (D.C. Cir. 1994).  That Congress intended for Lewis' sentence to follow his conviction and criminal history is not so atypical as to amount to unusual circumstances.

Lewis' argument may be more applicable to a variance from Guideline sentences than a departure under U.S.S.G. § 5K.  The Court could, lawfully, consider race in its variance analysis. see, e.g., Williams v. New York. 337 U.S. 241, 247 (1949)(Black, J.), although, in doing so, it would run afoul of other rules, like U.S.S.G. § 5H1.10.  The Court will decline to consider race in its variance analysis or, more accurately, give it weight in its variance analysis.  Congress and the Sentencing Commission may consider the impact of their decisions on society and particular races; at the wholesale level, they need to be cognizant of the impact of their laws and guidelines in that context.  At the retail level, however, the federal sentencing courts should be colorblind.  It is hard enough to create a sentence that reflects all the § 3553(a) factors for each individual defendant without trying to find one that cures all of society's penal problems.

**IT IS ORDERED** that the Sealed Motion to Reconsider Sealed Order Denying Motion for Relief Under Section 404 of the First Step Act, filed May 15, 2019 (Doc. 176), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
    United States Attorney
Paul H. Spiers
Adam S. Rowley
    Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Kari Converse
    Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

   *Attorney for the Defendant*